# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT

OF

# The State of Missouri

AT THE

## APRIL TERM, 1880.

(*Continued from Volume* 71.)

---

THE STATE ex rel. THE ATTORNEY GENERAL v. COLLIER.

**Bribery of the Public by Candidate for Office.** It is unlawful for
a candidate for public office to make offers to the voters to perform
the duties of the office, if elected, for less than the legal fees. An
election secured by means of such offers is void.

This is a proceeding by writ of *quo warranto* issued on
the relation of the attorney general. The information
stated that the respondent, Collier, had usurped and in-
truded into and was unlawfully holding and executing the
office of judge of probate in and for Callaway county, and

that he had no right or authority to hold the office; that, at the regular election held in said county for county officers on Tuesday, the 5th day of November, 1878, Middleton G. Singleton and the respondent were candidates for said office of judge of probate, and that said Singleton had, at the time of said election, attained the age of twenty-four years, and had been a male citizen of the United States for five years, was a citizen of the State of Missouri, and has been a resident of said county of Callaway for one year; that said Singleton at said election received 2,154 votes, and respondent received 2,342 votes.

The information further stated that on the 17th day of August, 1878, a public meeting of the citizens of said county was held at the city of Fulton, in said county, at which meeting were present about 1,000 citizens of said county, and at said meeting respondent presented the following resolutions for its adoption, viz:

WHEREAS, Our county is burthened with debt almost beyond our capacity to pay; and

WHEREAS, It has become necessary for every one who is desirous of ridding ourselves of debt, the great destroyer of happiness, it is the duty of every man who is in favor of reducing the enormous and almost unbearable taxation, both county and State; and

WHEREAS, The products of our farm labor have depreciated fifty per cent or more; and

WHEREAS, The salaries of our county officers are larger than we can afford to pay; and

WHEREAS, There are plenty of good men, competent and honest, who are willing to perform the services of the respective offices of the county for the following compensation, viz:

| | |
|---|---|
| Collector, per year | $1,500 |
| Probate Judge per year, | 1,200 |
| County Clerk, per year | 1,200 |
| Circuit Clerk, per year | 1,200 |

Therefore, be it

*Resolved,* That we will support no man for the offices mentioned who will not agree to perform the services at the rate fixed in these resolutions.

*Resolved,* That we most heartily indorse the National democratic platform adopted at St. Louis; also the State democratic platform adopted at Jefferson City in July, and cordially invite all who have the cause of retrenchment and reform at heart to unite with us, and we further pledge ourselves to vote for no man to represent our county in the general assembly who does not fully indorse our platform, and who will not pledge his energies and abilities to incorporate the doctrines set forth in these resolutions in the statutes of the State; also to use his every effort to secure the passage of a bill fixing the legal rate of interest at six per cent instead of ten per cent, the present rate.

*Resolved,* That we will not vote for any man who is not in favor of making notes and bonds and other indebtedness null and void, that are not given in for taxation.

*Resolved,* That every man who indorses our platform pledge himself to vote for the men that this mass-meeting recommends at the November election; and be it further

*Resolved,* That we ask our sister counties to join with us in this great work of reform, that we may sweep from place and power the leeches that suck our life's blood. Be it further

*Resolved,* That king caucus is dead.

The information further stated that said resolutions were adopted by said meeting as a platform on which to nominate and vote for various officers, among others said officer of judge of probate; that said respondent was nominated by said meeting for judge of probate, that respondent accepted said nomination on said platform and canvassed said county for said office on said platform, and in divers public speeches made to the voters of said county during said canvass, said respondent declared and promised that he would perform the duties of said office for $1,200 per annum, and no more, although the salary of said officer

consisted of fees allowed by law, which amounted to the sum of $2,600 per annum; that said respondent, in order to obtain votes for said office, publicly declared to said voters on divers occasions during said canvass, that said fees amounted to the sum of $2,600 per annum, but that he would perform the duties of said office, if elected, for the sum of $1,200 as hereinbefore stated; that said respondent, in order to obtain votes for said office, further declared at divers times and places in said county during said canvass to the voters of said county, that they, by electing himself as judge of probate, and others for other officers named as candidates on the aforesaid platform, would save to the county $5,600 per annum; that respondent caused the aforesaid resolutions or platform, and the fact that he was a candidate for judge of probate thereon to be published in public newspapers in said county from and after said 17th day of August, 1878, to the said 5th day of November, 1878, the day of said election; that respondent further, in order to carry out his corrupt offers as aforesaid and to procure votes for said office, caused tickets to be printed with the following heading thereon : "Low Salary Democratic County Ticket," and caused said tickets to be placed in the hands of said voters at said election, and by said words on said tickets, so printed, did further publish and proclaim to said voters his said corrupt offers with the view of inducing said voters to believe that in voting for him for said office they would reduce the expenses of said county; that all the ballots cast for respondent at said election had said words as aforesaid printed at the head thereof; that more than 200 legal and qualified voters of said county at said election, and who were intending, before the said unlawful and corrupt offers of respondent were made to the voters of said county, to vote for the said M. G. Singleton at said election, were unlawfully and wrongfully induced by said corrupt offers of respondent to change their purpose and vote for said respondent, and relying upon said offers as being lawfully made, and that the same were

legally binding upon respondent, did so change their purpose and vote for respondent for said office at said election, and were influenced and induced so to do solely by reason of said corrupt offers of the respondent, and but for said offers would have voted for said Singleton for said office at said election, and but for said offers said respondent would not have been elected; that respondent, notwithstanding said fraud, intent and corrupt practices as aforesaid, and notwithstanding his said unlawful and corrupt offers to the voters of said county at said election, as aforesaid, had received a commission from the governor of this State as judge of probate in and for said county of Callaway, in this State, under the pretended authority of said election held as aforesaid, and had usurped and intruded into said office and was then executing the same.

The information concluded with a prayer for a judgment of ouster.

Respondent demurred both generally and specially to the information.

*J. L. Smith*, Attorney-General, for relator.

*Boulware, Snell & Flanagan* for respondent.

SHERWOOD, C. J.—The legal sufficiency of the information being questioned by the demurrer, requires at our hands an examination into such alleged sufficiency.

Every one will concede that it is of the highest importance that popular elections should be conducted in such a way as to exempt them, so far as the infirmities incident to human agencies will permit, from improper influences. Here the demurrer confesses that being induced by the offers of respondent, to take for his own use only $1,200 out of $2,600, the aggregate fees of the desired office of judge of probate, 200 of the voters and tax payers of the county, who would otherwise have voted for respondent's

rival, changed their purpose and voted for respondent, who but for such offers and their acceptance, would never have been elected. These admissions of the demurrer throw the burden of the assumed lawfulness of his acts upon the shoulders of the respondent. The question arising upon the admitted facts is whether the means employed by him to secure his election were lawful means, means such as this court can sanction, when the respondent, called upon by our writ of *quo warranto* to disclose his title to the office of judge of probate, discloses also that his title must, for its validity, ultimately rest upon the means of whose employment the State in her information complains.

In the recent case of *State ex rel. Newell v. Purdy*, 36 Wis. 213, (*s. c.*, 17 Am. Rep. 485,) the question raised by this information was learnedly and exhaustively discussed, and in such a manner as to leave nothing to be desired, and the conclusion there reached, that means similar to those employed in the present instance were not to be tolerated, and that the title to the office secured thereby would be declared invalid. There the contest was between two individuals as to whom was entitled to the office of county judge, the relator claiming it in consequence of the reception of twenty-three more votes than the incumbent, but the latter claimed, in his answer, that the salary of county judge was fixed at $1,000 ; that relator being a candidate for the office, published and circulated through the county a promise addressed to the electors thereof, that, if elected county judge, he would perform all the duties and furnish an office, and all other incidentals except the record books, for $600 per annum, during his term, and that solely by this offer 100 voters of the county were induced to vote for relator, thus securing his election. This answer was held sufficient on demurrer.

I am unable to distinguish this case in principle from that one. Here, it is true, the result of the respondent's action, if he complies with his promise, will not be as there, the enriching of the county treasury by refraining from

withdrawing therefrom a sum of money, thereby benefiting pecuniarily each tax payer in the county; but the legal effect of the offer of the respondent is in no wise different; for while he did not propose to enrich the treasury of the county, as in the Wisconsin case, he did propose to impoverish himself, and to benefit every suitor who might come before him in his judicial capacity, by diminishing his lawful fees to less than one-half their usual rate. In other words, he appealed, and the demurrer admits he was successful in that appeal, not to the fair and honest judgment of the voters touching his qualifications and fitness for the office to which he aspired, but to the cheapness with which he would discharge his judicial duties. He· said to the voters in effect and with effect: "Elect me probate judge of your county, and no suitor who comes before me shall ever be charged even half the fees which the law allows;" thus making the office which he sought not a matter of qualification but of bargain and sale.

It is not necessary in this case to show, as claimed by counsel for respondent, that he, or those who voted for him, have been guilty of the crime of bribery in its strict sense. In instances like the present; instances involving the freedom and purity of elections, that term possesses a broader significance. As is well said in the case above cited: "It may properly be employed to define acts not punishable as crimes, but which involve moral turpitude or are against public policy." And there the court held that though the answer did not contain allegations of fact showing that the relator or any of the voters of the county had been guilty of the criminal offense of bribery, yet that answer was sufficient, and that acts falling short of that crime in its more restricted and technical meaning would justify the rejection of votes cast for the party made successful by the employment of the unlawful means, and Hawkins Pleas of the Crown is quoted from extensively, and fully supports the position taken, where he says: "Also, bribery sometimes signifies the taking or giving of a reward

for offices of a public nature, and certainly nothing can be more palpably prejudicial to the good of the public than to have places of the highest concernment, on the due execution whereof the happiness of both king and people doth depend, disposed of, not to those who are most able to execute them, but those who are the most able to pay for them; nor can anything be a greater discouragement to industry and virtue than to see those places of trust and honor which ought to be the rewards of those who, by their industry and diligence have qualified themselves for them, conferred on such who have no other recommendation but that of being the highest bidders; neither can anything be a greater temptation to officers to abuse their power by bribery and extortion and other acts of injustice than the consideration of the great expense they were at in gaining their places, and the necessity of sometimes straining a point to make their bargain answer their expectation." Vol. 1, ch. 27, § 3. Again, the learned author says: "It is of the utmost importance to the public welfare, that in the administration of the government, none but persons competent to perform the duties of their offices should be admitted into any department. But if the sale of offices were allowed to those who have the patronage and appointment, it is evident that there would be the greatest danger of situations being filled not by those whose talents fitted them for the station, but whose purses enable them to obtain it. The sale of offices may, therefore, justly be ranked as an offense against the political economy of the State." Vol. 1, ch. 32, p. 748.

In *Tucker v. Aiken*, 7 N. H. 140, a similar view was taken concerning a practice which had obtained of putting up at public auction and disposing of the office of constable to the highest, and of collector to the lowest bidder; the court there saying, in reference to the custom: "It has a tendency to divert the attention of the electors from the qualifications of the candidates to the terms on which they will consent to serve, and makes the choice turn upon con-

siderations which ought not to have an influence." The doctrine in that case, so far as concerns public officers, met with approval in Massachusetts, the court, in *Alvord v. Collin*, 20 Pick. 428, saying : " We fully recognize the validity of the objection to the sale of offices, whether viewed in a moral, political or legal aspect. It is inconsistent with sound policy. It tends to corruption. It diverts the attention of the electors from the personal merits of the candidates to the price to be paid for the office. It leads to the election of incompetent and unworthy officers, and on their part to extortion and fraudulent practice to procure a remuneration for the price paid. Nor can we discover a difference in principle between the sale of an office for a valuable consideration and the disposing of it to a person who will perform its duties for the lowest compensation. In our opinion the same objection lies against both."

And the legislature of Massachusetts applied the principle now being discussed, in a still more marked manner, in the year 1810. The town of Gloucester, though entitled to six representatives, for economical reasons was accustomed to return but two members, whose pay had by law to be furnished by the town. In that year, however, for political considerations, it was deemed desirable that the entire number of representatives, to which the town was entitled, should be elected ; whereupon several individuals with a view to induce the town to elect a full delegation, gave a bond, for the use of the inhabitants, conditioned, that the whole expense of such a representation should not exceed the pay of two members. But it was held by the legislature that the election was void, though none of the members elected from the town had any agency whatever in procuring the execution of the bond. The supreme court of Wisconsin, after citing the above and other authorities, says : " The doctrine which we think is established by the foregoing authorities, and which we believe to be sound in principle, is that a vote given for a candi-

date for a public office in consideration of his promise, in case he shall be elected, to donate a sum of money or other valuable thing to a third party, whether such party be an individual, a county or any other corporation, is void."

We must regard the cases above cited as conclusive of this one, and reiterate the statement that the offers in this case made by respondent differ in no essential particular from the Wisconsin case; the offers in each case are equally deserving of condemnation, and were in spirit and purpose the same. For if bribery in its larger sense, in its application to election cases, is the promise by the candidate to donate, if elected, a sum of money or other valuable thing to a third party, the promise in the case at bar ought to be held as falling within the same category, since though the suitors who may have to appear before the candidate when judge of probate, cannot in the nature of things be designated, yet the corrupting tendencies of the offer remain the same; remain to swerve the voter from his duty as a citizen; to blind his perceptions as to the sole question he should consider, the qualifications of the candidate, and to fix them upon considerations altogether foreign to the proper exercise of the highest right known to freemen, the right of suffrage; a right upon whose absolutely free and untrammeled exercise depends the perpetuity of our republican institutions. The transaction of which the State in the present instance complains may have been entered into with laudable motives, but it is, as we think has been successfully shown, decidedly demoralizing in its tendencies, and utterly subversive of the plainest dictates of public policy. The maxim in such cases should be: *obsta principiis*; and it is only by a rigid observance of this by the courts, that the purity of elections can be preserved. The legislature of this State has, as we are informed, at its last session enacted a statutory prohibition against the employment in elections, of agencies such as we have in the preceding pages condemned, thus giving legislative recognition to the principles herein enunciated. [See Rev. Stat.

1879, p. 258, § 1478.—REPORTER.]   Holding these views the information will be held sufficient in law, the objection taken thereto by the demurrer not well taken, and the respondent required to plead further.   All concur.