## State ex rel. Newell vs. Purdy.

Quo Warranto. *Bribery of electors by offering to perform the duties of a public office for a sum less than the salary.*

1. If a sum of money, or any property, is offered to individual electors, for their votes at any election held under the laws of this state, all votes shown to have been obtained thereby will be rejected by the court in an action to determine the right to the office. *State ex rel. Hopkins v. Olin*, 23 Wis., 327.

State ex rel. Newell vs. Purdy.

2. In like manner, a vote given for a candidate for any public office in consideration of his promise, in case of his election, to donate a sum of money or other valuable thing *to a third party*, whether such party be an individual or a county, or any other corporation, will be rejected as void by the court when called upon judicially to declare the result of the election.

3. Under the laws of this state (Laws of 1867, ch. 75, secs. 1 and 2; Laws of 1868, ch. 121), the board of supervisors of a county have power to fix the salary of the county judge, at their annual meeting next prior to an election for that office; and the salary so fixed cannot be changed during the term of office of the person chosen at such election. After the salary of county judge for a certain county was duly fixed at $1,000, the relator, being a candidate for the office, published and circulated through the county a promise addressed to the electors thereof, that, if elected county judge, he would perform all the duties and furnish an office " and all other incidentals except the record books," for $600 per annum, during his term. He received a majority of twenty-three votes for the office, over the defendant; but in this action to try the title to said office, the defendant alleges that one hundred electors of said county who voted for the relator at said election (and whose names are given), were induced to vote thus solely by said offer. On demurrer, the answer is *held sufficient*.

4. The case distinguished from those which have sustained the validity of bids or pecuniary offers to secure the location of public buildings at a particular place.

Action in the nature of *quo warranto*, brought in this court to determine which of the parties is entitled to the office of county judge of Vernon county. At the election for that office held in April, 1873, the relator received 1,240 votes, and the defendant 1,217 votes therefor. Both parties claim to be elected; both filed the official oath and bond required by law; and the defendant is in possession and is performing the duties of the office, to the exclusion of the relator. The grounds upon which the defendant denies the right of the relator to the office, as stated in the answer, are, that after the board of supervisors had fixed the salary of the county judge to be elected at said election at $1,000 per annum, the relator became a candidate for the office, and, for the purpose of inducing the electors to cast their votes for him, published and caused to be extensively

circulated through the county, before the election, two commu-
nications, which are as follows:

"*To the voters and tax payers of Vernon county:* GENTLE-
MEN : While I entertain the highest respect for the judgment
and ability of each member of our county board of supervisors
in fixing the salaries of the county officers, and am satisfied
that no county has a better board, still I am well satisfied that
the work and incidentals can be well done and furnished for
the office of county judge for a less sum than $1,000 a year;
and feeling satisfied that I can give satisfaction in the perform-
ance of the duties of that office, I therefore, at the solicitation
of many friends, announce myself a candidate for the office of
county judge, for the next term, at the sum of $700 a year,
and pledge myself that, if elected, I will do the work and fur-
nish office, etc., for the said sum of $700 a year, and shall con-
sider myself under many obligations. Being, as I am, person-
ally acquainted with a large number of people of this county,
I need say nothing of my abilities to perform the duties of that
office. All of which is respectfully submitted. J. E. NEWELL.
"Dated January 15, 1873."

"VIROQUA, March, 20, 1873.

"*To the legal voters and tax payers of the town of* ——, *Vernon
county:* GENTLEMEN: Since some persons have charged me
with bad faith in the matters of the county judge's salary, I
deem it my duty to explain. Now here is my pledge: If I
should be elected to that office for the next term, I pledge my-
self to serve and furnish office and all other incidentals, except
record books, for the sum of $600 a year, and that I will take
no more or greater sum for any year. This pledge to remain
in the hands of the chairman of the town board of each town
in Vernon county. Yours respectfully, J. E. NEWELL."

It is alleged that the last of these communications (which
was addressed to the voters etc. of each town in the county),
was by the relator "placed in the hands of the chairman of the
board of supervisors of each town and election district in said

county, and by him, the said *J. E. Newell*, caused to be read to the assembled voters in each town and election district in said county, on the morning of the day of the election for said county judge."

The answer names one hundred voters and tax payers of the county, who, it is stated therein, voted at such election. Concerning the votes of these persons the answer contains the following averments:

" The defendant further shows, upon information and belief, that the following legal voters and tax payers of said county of Vernon, who voted at said election before the said unlawful and corrupt offers of the relator, *J. E. Newell*, were made to the voters and tax payers of said county, were intending to vote for this defendant for the office of county judge of said county of Vernon, at the election next to be held and afterwards held in said county, as set forth in the complaint of the plaintiff, but were unlawfully and wrongfully induced by said corrupt offers of the relator to change their purpose, and vote for the said relator, and, relying upon such offers as being lawfully made, and that the same were legally binding upon the relator, did so change their purpose, and vote for the relator for said office at said election, and were influenced and induced so to do, solely by reasons of said corrupt offers of the relator, *J. E. Newell*, and but for said offers would have voted for this defendant for said office at said election."

The plaintiff demurred to so much of the answer as sets out the above recited facts, as not stating a defense.

*The Attorney General*, for the demurrer.

*J. H. Carpenter*, of counsel, with *Carson Graham* and *Wm. F. Terhune*, defendant's attorneys, *contra:*

1. It is bribery to pay money to a voter, or to promise him money or *any other pecuniary consideration* whereby he is induced to vote, or to forbear voting, or whereby he is induced to vote for a particular candidate. *Rex v. Vaughan*, 4 Burr., 2494; *Hughes v. Marshall*, 2 Tyrwhitt, 134; *Rex v. Isherwood*,

2 Kenyon, 202; *Rex v. Plympton*, 2 Ld. Raym., 1377; *Rex v. Cripland*, 11 Mod., 387; *Comm. v. Shaver*, 3 W. & S., 338; *Comm. v. Callaghan*, 2 Va. Cas., 460; *State ex rel. Hopkins v. Olin*, 23 Wis., 309; 3 Bishop's Cr. Law, § 15; 1 Hawkins' P. C. (Curwen's ed.), 414–15; 1 Russell on Crimes (ed. by Greaves), 154.    2. Though the offer here was to pay the county, and not the voters *directly*, yet it was an offer of pecuniary benefit to the voter and tax payer by diminished taxation, if he would vote for the relator and secure his election.    It is none the less an *offer to bribe*, and, if accepted, none the less *bribery*, because of its circuity.    *Cook v. Shipman*, 24 Ill., 614; *Nichols v. Mudgett*, 32 Vt., 546.    "The taking or giving of a reward for an office of a public nature, is said to be bribery."    Bac. Ab., "Offices."    The sale of an office to the best bidder is contrary to sound policy; and an election pursuant to the sale is illegal. *Alvord v. Collin*, 20 Pick., 418; *Tucker v. Aiken*, 7 N. H., 113; *Meredith v. Ladd*, 2 id., 517; *Carleton v. Whitcher*, 5 id., 196; *Prop'rs of Cardigan v. Page*, 6 id., 182; *Blackford v. Preston*, 8 Term, 89.    3. All votes obtained by the pecuniary inducement offered by the relator are illegal, and must be disregarded by the court in this action.    *State ex rel. Hopkins v. Olin*, 23 Wis., 309; *People v. Pease*, 30 Barb., 588.

LYON, J.    It is provided by statute as follows: "At the annual meeting in November, in every year hereafter, the county board of supervisors for the several counties shall fix and determine the amount of the annual salary that shall be received by each and every county officer who is to be elected in their respective counties during the ensuing year, and whose annual salary the said supervisors have now or may hereafter have authority to establish.    The salary thus determined upon for each and every such officer, shall be and remain his salary, without increase or diminution, during his term of office." Laws of 1867, ch. 75, secs. 1 and 2 (Tay. Stats., 304, §§ 62, 63).

Chapter 121, Laws of 1868, conferred upon the board of supervisors authority to fix the salary of the county judge. Pursuant to these statutes, the board of supervisors of Vernon county, at the annual meeting in November, 1872, fixed the salary of the county judge of that county to be elected in the following April, at $1,000 per annum. The annual salary of the judge then elected was thus fixed at the sum named for his whole term, and the board of supervisors had and have no power to change it.

Hence, the proposition of the relator to the electors of the county, which is set out in the answer, was simply an offer that if they would elect him to the office of county judge, he would give the county four hundred dollars per annum, together with certain articles of personal property (the value of which is not stated), so long as he should hold the office under such election. In view of the absolute right of the person elected to receive the salary fixed by the board, and which the board had no power to change, the proposition of the relator admits of no other construction.

Had the relator offered the same or any other sum of money, or any property, to individual electors of the county for their votes, all votes which he obtained thereby would be rejected by any court called upon to determine his right to the office; and although the election might not be declared void because of such offer, yet if the number of votes so rejected were sufficient to change the result of the election, judgment would go against the relator. *State ex rel. Hopkins v. Olin*, 23 Wis., 327, and cases cited.

The case we have supposed involves the *crime* of bribery, but that term has a more extensive signification. It may properly be employed to define acts not punishable as crimes, but which involve moral turpitude or are against public policy. In this case the answer does not contain allegations of fact showing that the relator or any of the voters of the county had been guilty of the criminal offense of bribery; and the question is,

whether any acts short of that will justify the rejection of votes cast for the relator.

Hawkins, in his treatise on the Pleas of the Crown, after defining the term bribery when used in a strict sense, that is, as descriptive of a crime, proceeds thus: "Also bribery sometimes signifies the taking or giving of a reward for offices of a public nature. And certainly nothing can be more palpably prejudicial to the good of the public than to have places of the highest concernment, on the due execution whereof the happiness of both king and people doth depend, disposed of, not to those who are most able to execute them, but those who are the most able to pay for them; nor can anything be a greater discouragement to industry and virtue, than to see those places of trust and honor which ought to be the rewards of those who by their industry and diligence have qualified themselves for them, conferred on such who have no other recommendation but that of being the highest bidders; neither can anything be a greater temptation to officers to abuse their power by bribery and extortion and other acts of injustice than the consideration of the great expense they were at in gaining their places, and the necessity of sometimes straining a point to make their bargain answer their expectation." Vol. 1, ch. 27, sec. 3. Again the same learned author says: "It is of the utmost importance to the public welfare, that, in the administration of the government, none but persons competent to perform the duties of their offices should be admitted into any department. But if the sale of offices were allowed to those who have the patronage and appointment, it is evident that there would be the greatest danger of situations being filled, not by those whose talents fitted them for the station, but whose purses enabled them to obtain it. The sale of offices may therefore justly be ranked as an offense against the political economy of the state." Book 1, ch. 32, p. 748. It will thus be seen that the sale and purchase of an office is considered as a kind of bribery. The effect of bribery, by the rules of the common law,

independently of any constitutional or statutory provision on the subject, is thus stated by Lord GLENBERVIE in his note to the case of *St. Ives*, 2 Election Cases (Douglas), 403 : "It is essential to the very idea of *election*, that it should be *free*, and this has been declared by the legislature in the statute of Westminster I (3 Edw. I., ch. 5), with regard to elections in general, and by the Declaration of Rights (1 W. & M., 2 Sess., ch. 2) with regard to elections of members of parliament. Hence it is understood that, independent of positive statutes against bribery, whenever a person is returned in consequence of an undue influence acquired by that means, his election is void ; and that every vote purchased by bribery is also void ; the person who gave his vote under such influence being to be considered as if he had not voted at all."

It is believed that the term *bribery* is here employed in the larger sense mentioned in Hawkins, and includes the buying or selling of an office, or any unlawful payment of money to procure an office, as well as the direct bribery of an elector.

As early as 1678, the house of commons made a standing order declaring it bribery if a candidate for the house should give or promise any gift or reward to the county, town or borough from which he sought to be returned to parliament, after writs of election had been issued ; and the order punished the person so offending by expulsion and a limited disqualification. 2 Douglas, 404. In later times the principle of this order has been enacted into laws which impose severe penalty for any improper use of money, or any promises to pay money, to influence elections.

The statute of Westminster cited in Douglas, is this : "And because elections ought to be free, the king commandeth upon great forfeiture, that no man by force of arms, nor by malice or menacing, shall disturb any to make free election." 3 Edw. I, ch. 5 (A. D. 1275).

The same principles have frequently been recognized in this country. The cases in New Hampshire, cited by the counsel

State ex rel. Newell vs. Purdy.

for the defendant, are to the effect that it is against public policy to sell public offices to those who will pay the most for them, or to bestow them upon those who will discharge their duties for the least compensation.   It seems that a practice had prevailed in that state of putting up at public auction, and disposing of the office of constable to the highest, and of collector to the lowest bidder.   In *Tucker v. Aiken,* 7 N. H., 140, the court says: " Setting up an office at auction in the manner the town of Derry did in this instance, has all the mischief of a sale.   It has a tendency to divert the attention of the electors from the qualifications of the candidates to the terms on which they will consent to serve, and makes the choice turn upon considerations which ought not to have an influence.   *   *   * A collector thus chosen is not fit to be trusted with the power to seize the goods and arrest the bodies of citizens, especially of citizens who do not concur in the choice.   And if an action of trespass had been brought against Stowell for taking the goods mentioned in the declaration, he would probably have found it very difficult to show a legal defense.   In such a case the legality of his election might have been examined and settled."   Here is a strong intimation that an election thus obtained is void, and such is the fair inference to be deduced from the other cases in that state.   If void, it is because the means employed to secure the election contain, so far as the public and the state are concerned, all the essential elements of bribery.   It should also be observed that the question in that state was not presented by any constitutional or statutory provision, but was considered entirely on common law grounds.

In *Alvord v. Collin,* 20 Pick., 428, the court say : " We fully recognize the validity of the objection to the sale of offices, whether viewed in a moral, political or legal aspect.   It is inconsistent with sound policy.   It tends to corruption.   It diverts the attention of the electors from the personal merits of the candidates to the price to be paid for the office.   It leads to the election of incompetent and unworthy officers, and on

their part to extortion and fraudulent practices to procure a remuneration for the price paid. Nor can we discover a difference in principle between the sale of an office for a valuable consideration and the disposing of it to the person who will perform its duties for the lowest compensation. In our opinion the same objection lies against both." That court thus agreed to the doctrine of the New Hampshire court, but held that a collector of taxes was not within the principle, because his employment is not a public office.

A very notable case in which the same principle was applied by the legislature of Massachusetts, occurred in the year 1810. It seems that certain towns were each entitled to several representatives in the legislature, and among them the town of Gloucester was entitled to six representatives. Each town was required by law to pay its own members, and for economical reasons the town of Gloucester usually returned but two instead of six. For political reasons it was thought desirable that the town should elect a full delegation, and thereupon certain individuals, with a view to induce the town to do so, gave a bond for the use of the inhabitants, conditioned that the whole expense of a full representation should not exceed the pay of two members, and six members were accordingly elected. Although the members elect had no agency in procuring such bond to be given, the house of representatives, by a vote of 224 to 125, declared the election void and the seats of the whole delegation from Gloucester vacated. Reports of Controverted Election Cases, by Cushing, Storey & Josselyn (Mass.), 97 (*Gloucester Case*).

The doctrine which we think is established by the foregoing authorities, and which we believe to be sound in principle, is, that a vote given for a candidate for a public office in consideration of his promise, in case he shall be elected, to donate a sum of money or other valuable thing to a third party, whether such party be an individual, a county, or any other corporation, is void. The power to reject such vote is not vested in

the election canvassers, but is vested in the court which is called upon to determine judicially the result of the election.

The grounds upon which this doctrine is based, are so clear-ly and fully stated in the above extracts from the authorities, that it seems unnecessary to repeat them. Indeed, every intelligent person knows that free, unbiased, and (in the language of some of the books) indifferent elections are absolutely essential to the existence of free institutions.

It was argued by the learned attorney general, that the proposition made by the relator to the voters of Vernon county was merely a protest against high salaries, and, being in the direction of reform and economy in public expenditures, should rather be commended than censured. Promises made to the people by candidates for public office, that, if elected, they will practice a rigid economy in the expenditures of their several departments, are unobjectionable; and if the successful candidate fulfills his pledges in that behalf, he is entitled to commendation. In such case, the candidate only promises to perform a legal and moral duty. For example, should a candidate for governor promise that, if elected, he would discharge all persons employed by the state whose services are not needed, or that he would prevent all unnecessary expenditures of public funds, so far as he may have power to do so, this is only a promise that, if elected, he will in those respects faithfully perform the duties of his office. In other words, it is a promise that he will not violate his official oath. But should such candidate propose to the voters and tax payers of the state, that if they will elect him to the office of governor he will serve the state therein gratuitously or for one-half of the salary allowed by the constitution, and pay the rent of an executive office and the expenses of fuel, stationery and other incidentals pertaining thereto, out of his own pocket, his proposition has an entirely different aspect. In the one case the candidate promises that if he is elected he will regard his official oath and faithfully and honestly discharge his official duty ; while in the

other case he proposes to buy the office with promises to pay therefor in personal services or money, or both. The one tends to economy and true reform, but the tendency of the other is to introduce into elections a most mischievous element, very nearly allied to bribery ; an element which never has been tolerated (and never can be with safety) by any free government.

But we are told that propositions similar to that of the relator are very frequently made by candidates for public offices. We have seen no case in the books, and none is within the recollection of any member of this court, before the present case was brought to our notice, where a candidate for an important judicial office has offered to donate money or official services to the public as a consideration for his election. We must be permitted, therefore, to doubt whether such transactions are of frequent occurrence. On the contrary, we think they are not sustained by an enlightened public sentiment, and that they occur very rarely.

If the course pursued by the relator should receive judicial sanction, it is more than probable that all those public offices which are deemed desirable, would, in time, become the objects of pecuniary bids or offers, and, in many cases, would be bestowed upon the highest bidders without much regard to their fitness for the positions thus purchased by them. At least such would be the inevitable tendency. The evils of such a condition are of very grave import; and we are warned by the experience and the wisdom of centuries, to avoid them. When our elections to fill public offices cease to express the free, intelligent and unbiased judgment and choice of the electors ; when they shall be controlled or materially influenced by pecuniary offers made by the candidates, whether to the electors, or to the municipality (which is but the aggregation of the electors)— a most vital condition of free government will be disregarded. The tendency might be, in such case, to banish from the public service all who will not pay for the privilege of being employed therein, and to fill it with less scrupulous, and there-

fore less trustworthy and less deserving men. Elections by. the people might thus cease to express the free and unbiased judgment and will of the people, but might be controlled by mercenary considerations, either public or private, or both, and would thus speedily and justly fall into public contempt.

So far as we are advised, no judicial tribunal has given any countenance whatever to any practice or act which tends in that direction, but the courts have steadily held that popular elections must be kept free from any taint of corruption, and from all improper or unlawful influences whatever. We have no disposition to depart from this line of adjudication. On the contrary, were the opposite doctrine asserted in any of the cases, we should not follow them. We would not hold that a man may buy a public office, especially a most important and responsible judicial office, just as he would buy a horse at auction, that is, by offering to pay more for it than any other person is willing to pay. We can never give the sanction of this court to a doctrine so pernicious.

Reference should be made to the cases which have sustained the validity of bids or pecuniary offers to secure the location of public buildings at some particular place. We have no controversy with these cases here. The distinction between the election of public officers to whom, for the time being, the exercise of the functions of sovereignty is entrusted, and the mere choice of a site for a public building, is quite apparent. The former involves, or may involve, the integrity of the government and the preservation of the principles upon which it is founded; while the latter is only a matter of public convenience or pecuniary interest, involving no fundamental principle whatever.

It follows from the foregoing views, that if the defendant succeeds in showing, as he alleges in his answer, that a number of the electors, exceeding the majority of the relator, were influenced to vote for the relator solely by reason of the offers or propositions made by him as aforesaid, the votes obtained

should be rejected, and the defendant adjudged entitled to the office.

The demurrer to the answer must therefore be overruled.

*By the Court.* — Demurrer overruled.