# Kluemper v. Zimmer.

# Bailey v. Pieper.

(Decided June 9, 1931.)

STEPHENS L. BLAKELY and JOHN T. MURPHY for appellants.

SAWYER A. SMITH and STANLEY CHRISMAN for appellees.

OPINION OF THE COURT BY JUDGE WILLIS—Reversing.

Covington is a city of the second class operating under the commission form of government. Ky. Stats., sec. 3235c-1 et seq. At the city primary held October 19, 1929, Charles W. Zimmer, Sr., Lewis Meyer, Joseph Pieper, and Monroe Swindler were nominated for the four commissionerships. They were supported by an organization desiring and favoring the city manager form of government, and were widely advertised as the "City Manager Ticket." They were opposed by Theodore Kluemper, Thomas Bailey, and two other gentlemen, who were nominated in the same primary. Ky. Stats., sec. 3235c-6. In the final election the four city manager candidates were awarded certificates of election. Theodore Kluemper instituted a contest against Charles Zimmer, Sr., and Thomas Bailey instituted a contest against Joseph Pieper. The contestants did not claim the offices themselves, but questioned the right of the contestees to take them because of violation of the Corrupt Practices Act, and upon other grounds not necessary now to be noticed. The circuit court dismissed the contests, and the contestants have prosecuted appeals. The cases have been prepared and tried together, involve similar questions and will be disposed of in a single opinion.

It is first contended that the circuit court had no jurisdiction of the contest, upon the ground that the board of commissioners was the judge of the election and qualification of its members. The charter of cities of the second class, adopted in 1894, provides: "Each board shall adopt rules for its proceedings, determine the election and qualification of its members, except as hereinafter provided, punish its members for contempt or disorderly conduct, and, two-thirds of the members concurring, may expel a member, but not twice for the same offense." Section 3043, Ky. Stats. The statute applied to the general council of the city, consisting of a board of aldermen and a board of councilmen. That section, as well as similar ones in other charters, has been held not to apply if the contest involved the title of

so many members of the board of council or aldermen as to destroy a quorum. In such cases any contest must be instituted in the circuit court. Section 1596a-12; Scholl v. Bell, 125 Ky. 750, 102 S. W. 248, 31 Ky. Law Rep. 335; Lilly v. O'Brien, 224 Ky. 474, 6 S. W. (2d) 715; Craft v. Davidson, 189 Ky. 378, 224 S. W. 1082; Ratliff v. Tackett, 209 Ky. 588, 273 S. W. 441. The statute never applies to the board in office at the time the election is held, but authorizes each board elected to determine the election and qualification of its own members. No legislative board may try the title of the members elected to the succeeding board. Stack v. Com., 118 Ky. 481, 81 S. W. 917, 26 Ky. Law Rep. 343. It is suggested that the grounds of contest asserted in this case disqualified the other two members elected as commissioners, although their offices were not actually in contest, since they were elected on the same ticket upon the very issue that furnished the alleged disqualification, and were affected by the same grounds of challenge. In view of the conclusion we have reached, that question need not be discussed or decided.

The statute creating the commission form of government for cities of the second class, passed in 1910, provides: ''All laws applicable to and governing cities of the second class and not inconsistent with the provisions of this act shall continue to apply to and govern each city that may organize under this act. And all by-laws, ordinances, and resolutions in force in any such city and not inconsistent with the provisions of this act shall continue to be in force until altered or repealed in manner provided for in this act.'' Section 3235c-2. ''The mayor and the four commissioners shall constitute a board of commissioners. In this board of commissioners shall be vested all the legislative, executive and administrative power of the city, save as herein otherwise provided.'' Section 3235c-12. In defining the powers of the board of commissioners, no reference is made to the matter of determining the election and qualification of its members. Careful study of the statute convinces us that the provisions of section 3043 Ky. Stats., applicable to the general council, were not intended to be operative upon the board of commissioners under the commission form of government. The provision affected the internal organization and government of the councilmanic and aldermanic boards, and it did not constitute a law to govern the city, within the purview of section 3235c-2.

In the absence of a clear intention to incorporate into the commission form of government the internal regulations for the organization and government of the legislative boards under the other form, it cannot be held that they were included in an adoption of general laws for the government of the city. If it had been intended to make such provisions apply in the new situation, such purpose would have been plainly expressed, and not left to be derived from terms so uncertain and ambiguous. Numerous contests of this type have been determined by the court without mentioning the matter now advanced. Whitney v. Skinner, 194 Ky. 804, 241 S. W. 350; Lilly v. O'Brien, 224 Ky. 474, 6 S. W. (2d) 715; Burns v. Lackey, 171 Ky. 21, 186 S. W. 909. Van Meter v. Burns, 176 Ky. 153, 195 S. W. 470. In Martin v. Eagle, 236 Ky. 267, 32 S. W. (2d) 1020, the point was suggested, but the title of each of the commissioners was contested, and they were not, in any event, qualified to try the contests. Hence it was not necessary to determine the question now presented. The careful enumeration of duties and powers and the meticulous provisions for the organization of the board, without express reference to the subject of determining the election and qualificatons of the members, is wholly inconsistent with the assumption that it was designed to confer such authority upon the board of commissioners. Moreover, such an important power should be clearly conferred by statute, and not left to mere doubtful inference. We conclude that the court had jurisdiction of the contest and are thus brought directly to a consideration of the merits.

The appellants had a right to contest the eligibility of their opponents, although not claiming themselves to be elected to the offices. Grinstead v. Scott, 82 Ky. 88; Potter v. Campbell, 155 Ky. 784, 160 S. W. 763; Francis v. Sturgill, 163 Ky. 650, 174 S. W. 753; Hardin v. Horn, 184 Ky. 548, 212 S. W. 573; Whitney v. Skinner, 194 Ky. 804, 241 S. W. 350; Morgan v. Revis, 215 Ky. 30, 284 S. W. 111; Combs v. Dixon, 215 Ky. 566; 286 S. W. 797. Certain taxpayers instituted an action under the Declaratory Judgment Act to declare Zimmer and other candidates associated with him disqualified, but it was held that such a question could not be raised or determined in that manner. Dietz v. Zimmer, 231 Ky. 546, 21 S. W. (2d) 999. But the question is presented by a contest, and, if Zimmer and Pieper were disqualified to hold the offices by reason of what they did and knowingly permitted to

be done for them by others in the primary and election, they may be deprived of the offices. Ky. Stats., sec. 1565b-11; Owsley v. Hill, 210 Ky. 285, 275 S. W. 797; McKinney v. Barker, 180 Ky. 526, 203 S. W. 303, L. R. A. 1918E, 581; Tackett v. Mayo, 211 Ky. 30, 276 S. W. 974.

In regular political primary elections, where a contest of the result is authorized by law, violations of the Corrupt Practice Act (Ky. Stats., sec. 1565b-1 et seq.) in the primary must be presented in a contest of the nomination and not otherwise. Hardin v. Horn, 184 Ky. 548, 212 S. W. 573. But no contest of a nomination for city commissioner under section 3235c-6 is allowed by law (Dodge v. Johnson, 210 Ky. 843, 276 S. W. 984), and a contest on a final election of such officer upon the ground that the successful candidate had violated the law in procuring his election involves an inquiry into the means and methods employed by him to secure the election, including his preliminary nomination.

The city manager form of government was made optional with cities of the second class by chapter 79 of the Act of 1928. But an identical statute (chapter 84, Acts of 1928) relating to third-class cities was held unconstitutional. City of Owensboro v. Hazel, 229 Ky. 752, 17 S. W. (2d) 1031. The reasoning of the opinion in that case applied with equal force to the statute concerning cities of the second class. Hence, when the election was held in Covington on November 5, 1929, there was no law authorizing the city manager form of government in such cities. An act to meet that situation was subsequently passed. Acts of 1930, c. 91, p. 310. The editor of a newspaper in Covington conceived the idea of changing the form of government in Covington without waiting for the enactment of a law, by getting four candidates for commissioners who would agree to elect a city manager and pay him out of their official salaries. Each commissioner is allowed by statute an annual salary of $3,600, Section 3235c-11. It was thought that a competent expert could be obtained for a salary of $12,000 per year, who would not be affected by the salary limitation provided by the Constitution. Section 246. Under the proposed plan, each commissioner would donate $3,000 of his salary each year to provide a fund for the payment of the compensation of a competent city manager. It was clearly the understanding of the people of Covington that the "City Manager Ticket," if elected, would employ a city

manager at $12,000 per year, to be paid by the commissioners out of their salaries. A group of leading men was formed to promote the plan, and four candidates were obtained who consented to the arrangement. They were Zimmer, Pieper, Meyer, and Swindler. The campaign was conducted exclusively on that issue, and the city manager candidates were successful. The question is whether such a proposition and promise submitted to the voters, and to be carried out by the successful candidates, disqualifies them from holding the offices. It does so undoubtedly if the Corrupt Practice Act was thereby violated. The office of commissioner is created by statute. The four commissioners, with the mayor, constitute the board of commissioners. The board is vested with all the legislative, executive, and administrative power of the city, and each commissioner is the head of an important department of the government, required to keep a public office. The salary of each commissioner was fixed by law at $3,600 per annum. Each commissioner is required to take an oath of office, and it was the sworn duty of each officer to administer the duties of his office according to law. Yet these candidates, in order to win the election, agreed to depart from the oath of office and to abandon the requirements of the form of government under which they were legally operating, to try an experiment not authorized by any law, and to pay the expense of the experiment out of their official salaries.

We may assume that Zimmer and his associates were actuated by a desire to serve the best interests of the city, but the proposition upon which they were elected was none the less as glaring as we have stated. Under the facts shown by the record, there is no room to doubt that Zimmer and his three associates permitted the voters to be induced to vote for them upon the express assurance and belief that each would donate $3,000 per year for the purpose of paying a city manager to be selected by them. The plan proved to be a popular one, and led to the nomination and election of the four city manager candidates. The record manifests that the adoption of the plan was the main issue between the candidates, and uppermost in the minds of the people.

The Corrupt Practice Act of Kentucky provides respecting candidates (section 1565b-3): "It shall be unlawful for any person who is a candidate for nomination or election for any state, county, city, town, munici-

pal or district office to expend, pay, promise, loan or become pecuniarily liable in any way for money, or other thing of value, either directly or indirectly, or to agree or enter into any contract with any corporation, association or person to vote for or support any particular thing or measure in consideration of the vote or support, moral or financial, of any such corporation, assocation or person, and it shall be unlawful for any corporation, association or person to demand that any candidate for .office shall promise or agree in advance or shall make any contract, oral or written, to support any particular individual, thing or measure, in consideration for the vote or the support, financal or moral, of such corporation or person, in any election, primary or nominating convention, but no expenditure made by any candidate, or others for him, for the purpose of employing and paying clerks and stenographers, or for printing and advertising, or in securing suitable halls for public speaking, or suitable headquarters, stationery and stamps or actual traveling expenses, shall be deemed illegal, and any person, corporation or company violating this section shall be fined in any sum not to exceed five thousand dollars ($5,000.00), or be imprisoned in the county jail not to exceed six months, or both.'' It is also provided that no candidate for a city office shall expend more than $500 in a primary or more than that sum in the final election. Section 1565b-18. Any nomination or election procured by a violation of any provision of the act shall be void. Section 1565b-11. It has been held that the act does not forbid the announcement by the candidate of deputies to be appointed by him, if elected. Van Meter v. Burns, 176 Ky. 153, 195 S. W. 470. And in Owsley v. Hill, Jr., 210 Ky. 285, 275 S. W. 797, it was held that the act did not refer to a candidate's promise to the entire people, from which all may derive a benefit. But that statement must be confined to the facts then before the court. Certainly a promise of a candidate to abdicate the duties of the office to which he aspired, or to decline or divert its lawful emoluments, or to create by mere administrative usurpation an extra-legal agency to govern the city, would not be embraced by the philosophy or reasoning of the court, even though it came within the letter of the opinion. It will be observed that the statute renders it unlawful for any candidate to expend, pay, promise, loan, or become pecuniarily liable in any way for money or other thing of value, either directly or indirectly. And

the limit of expenditure in city elections for all lawful purposes for the primary and final election combined is only $1,000. Yet each of these candidates promised and became pecuniarily liable, in so far as they could do so, for an annual payment of $3,000 for the entire term of office.

In California, the Purity Election Statute (St. Cal. 1893, p. 22) read:

"Sec. 19. It shall be unlawful for any person, directly or indirectly, by himself or through any other person—

"1. . . . to pay, lend, or contribute, any money or other valuable consideration to or for any voter, or to or for any other person, to induce such voter to vote or refrain from voting at any election, or to induce any voter to vote or refrain from voting at such election for any particular person or persons. . . .

"8. To advance or pay, or cause to be paid, any money or other valuable thing to or for the use of any other person, in consideration of being selected or indorsed as the candidate of any convention . . . for a public office. . . ."

One Head was a candidate to fill a newly created judgeship and promised the voters that, if elected, he would not qualify or occupy the office. His election was contested by his opponent. The case came to the Supreme Court of California (Bush v. Head, 154 Cal. 277, 97 P. 512, 515), and in disposing of it the court said: "The ground of contest, then, if there be any, must rest either on subdivision 3 of section 1111, or on the above quoted provisions of the Purity of Election Law. We need not inquire whether it falls within said subdivision 3, since we are satisfied that the act of 1893 authorizes a contest on the facts here set forth. Section 19 makes it unlawful for any person to offer or promise to pay 'any money or other valuable consideration' to induce any voter to vote in a particular way. Here the defendant made a promise in order to induce the voters to cast their ballots for him. The promise was that he would act in a way that would result in a saving of expense to the taxpayers and electors. This was a promise of a 'valuable consideration.' It is, of course, not every promise of pecuniary benefit to the voter that is in violation of statute. A promise by a candidate to limit the cost of

maintaining an office by administering it economically is no more than an undertaking to perform his duty, and is clearly not in conflict with the statute. But the promise here made went further than this. By it the candidate held out to the voters as an inducement, not the proper and efficient administration of the office, but the destruction, at least for a time, of an office created by law. It has been held, in several well-considered cases, that a promise by a candidate to discharge the duties of the office for less than the lawful salary or compensation is contrary to public policy, as in the nature of a bribe. McCrary on Elections, sec. 333; Carrothers v. Russell, 53 Iowa, 346, 5 N. W. 499, 36 Am. Rep. 222; State v. Purdy, 36 Wis. 213, 17 Am. Rep. 485; State v. Collier, 72 Mo. 13, 37 Am. Rep. 417; State v. Dustin, 5 Or. 375, 20 Am. Rep. 746. See, also, Tucker v. Aiken, 7 N. H. 113. As is said in Tucker v. Aiken, supra, 'the direct tendency of such practice is to introduce unsuitable persons into public employment—to induce the electors to give their suffrages to him who will work cheapest, instead of him who is best qualified.' The principle applies fully to the case at bar, where the promise was, in effect, that the duties of the office should not be performed at all, and that there would be no expense in connection with it. It is undoubtedly true, as is pointed out by the respondent, that the electors entertained a vain and futile hope if they believed that the office could be destroyed and left without an incumbent by means of the device sought to be employed. The failure on the part of the person elected to qualify would result in a vacancy, which could and should be filled by the Governor's appointment. But this consideration does not affect the illegality of the promise made, nor its sufficiency as a basis for contesting the election. The defendant made an offer to confer a pecuniary advantage upon the voters, and they, as is alleged, believing that the advantage would be conferred, acted upon the offer. The suggestion that the voters must be presumed to know the law, and that, so knowing, they could not be influenced by a promise which was not possible of fulfillment, is entitled to no weight.''

In Prentiss v. Dittmer, 93 Ohio St. 314, 112 N. E. 1021, 1022, L. R. A. 1917B, 191, a candidate for a judicial office promised that, in the event of his election, he would accept only the stipulated salary payable by the state, and would accept nothing payable to him from the local

treasury, provided by law to be paid. The court held the promise to be against public policy and within the purview of the statutes to prevent corrupt practices in elections. The court in its opinion said:

> "Promises of a character similar to those made by Prentiss have been held in other jurisdictions to be an offense invalidating the election of the promisor. Carrothers v. Russell, 53 Iowa, 346, 5 N. W. 499, 36 A. M. Rep. 222; State ex rel. v. Purdy, 36 Wis. 213, 17 Am. Rep. 485; Bush v. Head, 154 Cal. 277, 97 P. 512."

State v. Purdy, 36 Wis. 213, 17 Am. Rep. 485, was a quo warranto proceeding to determine the result of an election. It was held that a vote given for a candidate for any public office in consideration of a promise, in the event of his election, to donate a sum of money or other valuable thing, to a third party, whether such third party be an individual or a county or other corporation, will be rejected as void by the court when called upon judicially to declare the result of the election. In the opinion it was said:

> "Promises made to the people by candidates for public office, that, if elected, they will practice a rigid economy in the expenditures of their several departments, are unobjectionable; and if the successful candidate fulfills his pledges in that behalf, he is entitled to commendation. In such case, the candidate only promises to perform a legal and moral duty. For example, should a candidate for governor promise that, if elected, he would discharge all persons employed by the state whose services are not needed, or that he would prevent all unnecessary expenditures of public funds, . . . if elected, he will in those respects faithfully perform the duties of his office. In other words, it is a promise that he will not violate his official oath. But should such candidate propose to the voters and tax payers of the state, that if they will elect him to the office of governor he will serve the state therein gratuitously or for one-half of the salary allowed by the constitution, and pay the rent of an executive office and the expenses of fuel, stationery and other incidentals pertaining thereto, out of his own pocket, his proposition has an entirely different

aspect. In the one case the candidate promises that if he is elected he will regard his official oath and faithfully and honestly discharge his official duty; while in the other case he proposes to buy the office with promises to pay therefor in personal services or money, or both. The one tends to economy and true reform, but the tendency of the other is to introduce into elections a most mischievous element, very nearly allied to bribery; an element which never has been tolerated (and never can be with safety) by any free government." Compare State, ex rel. Lafollette, v. Kohler (Wis.) 128 N. W. 895, 69 A. L. R. 348.

In State v. Elting, 29 Kan. 397, Judge Brewer, afterwards a distinguished Justice of the Supreme Court of the United States, dealt with the same subject. In the opinion it was said:

"That a purchased vote given for an individual candidate for office is not to be counted, is conceded. So also that a candidate for office who purchases a vote therefor is not to have the office, is also beyond question. Our statute, respecting contesting elections provides as one of the grounds of contest, that 'the contestee has given or offered any elector, or any judge, clerk or canvasser of the election, any bribe or reward, in money, property, or thing of value for the purpose of procuring his election." (Comp. Laws 1879, p. 403, sec. 85, par. 4.) As a consequence of these rules it has been held, that a candidate for an office to which is attached a fixed salary, who offers to the electors to discharge, if elected, the duties of such office at less than the stated salary, is not entitled to have counted for him any votes given in consideration of such promise. (State ex rel. v. Purdy, 36 Wis. 213 [17 Am. Rep. 485]; State ex rel. v. Collier, 72 Mo. 13 [37 Am. Rep. 417]; Carrothers v. Russell, 53 Iowa, 350 [ 5 N. W. 499, 36 Am. Rep. 222]. See, also, Nicholas v. Mudgett, 32 Vt. 546; Cook v. Shipman, 24 Ill. 614; Tucker v. Aiken, 7 N. H. 113; State ex rel. v. Olin, 23 Wis. 309.)"

Again, in answer to the suggestion that no pecuniary reward to any voter arises from a promise to expend

money for a purpose not required by law, but calculated to appeal to the favor of voters, Judge Brewer wrote:

"A further question may arise when the offer of the candidate carries with it no pecuniary benefit to the voter. As, for instance, should a candidate for a county office offer to give if elected a portion of his salary for the erection of a public fountain; or, if a candidate for a state office should offer if elected to endow a chair in some college; here it may be said that the voter is in no way influenced by considerations of personal gain. He receives no money in hand, his taxes will not be reduced, and he may in no manner be pecuniarily benefited by the donation. This presents a case going still beyond those which have been decided, and yet very probably the same decision should control such a case, and for this reason; wrong considerations are thrown into the scale to influence the vote of the elector. The theory of popular government is that the most worthy should hold the offices. Personal fitness— and in that is included moral character, intellectual ability, social standing, habits of life, and political convictions—is the single test which the law will recognize. That which throws other considerations into the scale, and to that extent tends to weaken the power of personal fitness, should not be tolerated. It tends to turn away the thought of the voter from the one question which should be paramount in his mind when he deposits his ballot. It is in spirit, at least, bribery, more insidious, and therefore more dangerous, than the grosser form of directly offering money to the voter."

The principles thus forcefully expressed have become the keynote of the authorities upon the subject, and may be regarded as the fundamental and invariable test for the determination of the character and quality of a campaign promise.

In the case of Owsley v. Hill, 210 Ky. 285, 275 S. W. 797, the court agreed upon the principles of law, as enunciated herein, but divided upon the application of the law to the particular promise presented in that instance. Walker v. Taylor, 230 Ky. 689, 20 S. W. (2d) 727, dealt with a contest over a party nomination for the office of sheriff. Walker had issued a circular addressed

to the whole people, in which he promised "that no widow's cow or other property would be sold for taxes," and, if the taxes did not exceed $20, no widow or orphan would be required to. pay such taxes during his term of office. Obviously the law made no discrimination in favor of widows or orphans, but the appeal in their favor was plainly a popular one. It was held that Walker had violated section 1565b-3, Kentucky Statutes, and he was deprived of the nomination.

The promise in the present instance was not only to spend money for a purpose not authorized by law, but it also involved the discharge of official duties for less than the salary fixed. therefor, or a delegation thereof to another. The direct tendency was to divert the voters from the selection of public officials because of the character, capacity, and fitness of the candidates, and to determine the election by other and foreign considerations not only calculated, but directly designed, to subvert the system of city government established by law, and to set up a form of government by officials without lawful authority. Manifestly such a proposition constituted an unlawful practice, and we are constrained to the conclusion that it was against public policy and in violation of the statutes designed to preserve the purity of elections. Rigid adherence to such laws is essential to the permanence of our institutions founded upon the living principle that this is a government of laws and not of men. State ex rel. v. Kohler, supra.

The conclusion reached relieves us of the necessity of discussing the other grounds of contest set forth in the petitions.

The circuit court erred in dismissing the contests.

The judgment in each case is reversed, with directions to enter judgments in accordance with this opinion.

Whole court sitting.