## City of Middlesboro et al. v. Kentucky Utilities Co. et al.

Dec. 20, 1940.

James M. Gilbert, Judge.

834

Charles I. Dawson, H. L. Bryant and H. F. White for appellants.

Gordon, Laurent, Ogden & Galphin, W. E. Cabell, J. E. Sampson and Logan E. Patterson for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

The valdity of an issue of revenue bonds for the erection of a municipal electric distributing system and of a contract between the City of Middlesboro and the Tennessee Valley Authority to supply the city with

electricity for 20 years are the questions before the court. The power of the City to make the contract and the manner in which it was executed are challenged by the appellees, the Kentucky Utilities Company who with two individual citizens have sued as taxpayers. The case is the latest of a series running over a period of nearly ten years involving the electric franchise of the Utilities Company and the efforts of Middlesboro to establish its own plant. City of Middlesboro v. Kentucky Utilities Company, 237 Ky. 523, 35 S. W. (2d) 877; City of Middlesboro v. Kentucky Utilities Company, 255 Ky. 140, 72 S. W. (2d) 734; Kentucky Utilities Company v. Ginsberg, 255 Ky. 148, 72 S. W. (2d) 738; Ginsberg v. Kentucky Utilities Company, 260 Ky. 60, 83 S. W. (2d) 497; Board of Commissioners of City of Middlesboro v. Kentucky Utilities Company, 267 Ky. 99, 101 S. W. (2d) 414; Continental Illinois Nat. Bank & Trust Company of Chicago v. City of Middlesboro, 6 Cir., 109 F. (2d) 960. In the first mentioned case we held that the Kentucky Utilities Company had no franchise. The decision was followed by the United States Circuit Court of Appeals in the last cited case—a suit by the holder of bonds of the Kentucky Utilities Company raising the same question.

After the decision in Ginsberg v. Kentucky Utilities Company, supra, the City repealed previous ordinances authorizing the issuance of revenue bonds and adopted a new one on August 20, 1935. In Board of Commissioners v. Kentucky Utilities Company, supra, we held that the ordinance was subject to a referendum under the provisions of the general charter of cities of the third class operating under the commission form of government. Sections 3480b-14, 3480b-23, Kentucky Statutes. A majority of the voters approved the legislation in November, 1936. An ordinance providing for the issuance and ratifying a contract of sale of $175,000 of such bonds was adopted in September, 1937. In July, 1937, by procedure not questioned, the City and the Tennessee Valley Authority entered into a contract contemplating the erection or acquisition of a distributing system by the City and the construction of a transmission line to the city's gates. By this instrument the City bound itself to buy and the Authority to sell it electric energy for a period of 20 years. This suit was filed soon thereafter. The contract was then amended

on October 20, 1937, so as to eliminate terms which clearly created a debt by the City exceeding the limits permitted by Sections 157 and 158 of the Constitution. On a hearing for a temporary injunction before a member of this court, it was conceded that the contract as thus amended was still invalid, or, at least, open to serious objection because there had not been established a city utilities commission as prescribed by Section 3480d-20, and because the terms of the contract had the effect of surrendering partial control by the City of the plant or delegating municipal power to the Authority, contrary to the Statutes. Thereupon a temporary injunction was issued enjoining further execution of the contract.

On December 29th and 30th, 1937, the City undertook to adopt a re-written contract stated to be and regarded as an amendment of the original one. An effort was made in December, 1938, to correct procedure. That is the contract now involved. The circuit court enjoined its operation or further execution upon the ground that there had been no compliance with the Statutes which require advertisement or solicitation for bids before a city may enter into a contract for the expenditure of more than $500.

Section 3480d-1 et seq., Statutes (being an Act of 1932, Chapter 119, amended in 1936, Chapter 77), authorizes cities other than those of the first class to acquire electric plants by an alternate method, i. e., what is commonly known as a self-liquidating or revenue plan. The statute is specific as to what may be done and how the project shall be financed, but it does not define the complete procedure to be followed in order to accomplish the plan. It is contemplated, therefore, that the procedure prescribed in the charters in the several cities not inconsistent with the particular statute shall be observed. Kentucky Utilities Company v. Ginsberg, supra. That opinion (by Judge Dietzman, concurred in by other Judges, on motion for a temporary injunction and subsequently adopted as authoritative by the court as such) analyzes the 1932 Act and holds that in the absence of a different provision a referendum on the action of the Board of City Commissioners of Middlesboro in relation to the erection of the plant may be had under the charter of the city. The procedure prescribed by that charter for the adoption of ordinances is Sec-

tions 3480b-12, 3480b-13, and 3480b-14, of the Statutes. It is sufficient to say that the procedure was not observed in undertaking to enter into the contract with the Tennessee Valley Authority. We look to the primary and basic question, whether it is competent for the City to enter into the contract at all.

The authority of the City of Middlesboro to acquire or establish and operate an electric light and power plant with necessary appurtenances on the revenue liquidating plan is, as we have indicated, contained in Section 3480d-1 et seq., Kentucky Statutes. There is no specific authorization in the Act for the erection of a distributing system without a generating plant and for the purchase of electric current delivered into that system. But since the end to be accomplished is to provide the citizens with the service, and Section 3480d-21 of the Statutes declares that the act shall be liberally construed to effectuate its provisions, we are of opinion that it is within the purview of the statute to establish the distributing system only; hence that it is competent for the city to do so. Overall v. City of Madisonville, 125 Ky. 684, 102 S. W. 278, 31 Ky. Law Rep. 278, 12 L. R. A., N. S., 433; Kentucky Utilities Company v. City of Paris, 256 Ky. 226, 75 S. W. (2d) 1082. The question is whether or not the terms of the contract which has been assumed or made have the effect of partially, if not wholly, surrendering the management and operation of the system and of delegating municipal power specifically lodged in local officers by the law.

The statute comprehensively provides for the raising of funds for the acquisition or construction of electric plants by the issuance of revenue bonds, and for the disposition of funds collected from the sale of electric energy in order to secure the payment of the debt and proper maintenance, improvement and extension of the plant. To that end it is provided that "such rates shall be fixed and revised from time to time so as to produce these amounts." Section 3480d-9, Statutes. The City Council or Board of Commissioners "may provide by ordinance any such provisions and stipulations for the administration of the income and revenues and for the security of the bondholders" as may be deemed necessary. Section 3480d-17, Statutes. It is required by Section 3480d-20 that the city shall by ordinance appoint three commissioners "to operate, manage and control

said plant to be known as the City Utility Commission."
Each of these officers is required to execute bond in the
penal sum of $10,000, conditioned upon the faithful per-
formance of his duties. As observed in Eagle v. City
of Corbin, 275 Ky. 808, 122 S. W. (2d) 798, the qualifi-
cation and duties of the members of this commission
are set forth with particularity in order that it shall be
composed of interested citizens and taxpayers, free
from political influence. The statute clearly and defi-
nitely provides:

"Said Utility Commission shall have absolute
and exclusive control of said electric light, heat and
power plants and its operation and fiscal manage-
ment, regulation of rates and in every other respect
provided that in fixing rates said Commission shall
be governed by the provisions of Section 9 (Ken-
tucky Statutes, Section 3480d-9), hereof, and of any
ordinance enacted by the city council or board of
commissioners as provided in Section 9 (Kentucky
Statutes, Section 3480d-9), hereof.

"Said Utility Commission shall provide rules,
regulations and by-laws for the management of said
plant and out of the revenue of the plant it shall
pay operating expenses, repairs and additions
which may be necessary to be made thereto, and
provide sufficient reserve fund to insure the said
plant is kept in repair and in good working order
and to provide against any emergency which may
arise. Said Commission shall from time to time
pay to the city the surplus revenue derived from
the operation of the said plant as is provided in
Section 9 (Kentucky Statutes, Section 3480d-9)
and 10 (Kentucky Statutes, Section 3480d-10),
hereof."

Section 9 of the Act (Section 3480d-9, Statutes) di-
rects the city council or board of city commissioners to
adopt an ordinance definitely fixing and determining
the amount of revenue to be necessary to provide a sink-
ing fund and to maintain and operate the plant, and
provides that, "Such rates shall be fixed and revised
from time to time so as to produce these amounts."
We examine the contract in the light of that statute
to see whether there is conflict.

The contract, like the statute, is comprehensive

and specific. There are certain provisions in it which obligate the city to do no more than what the law requires of it, and others relating to the terms of purchase which are clearly within the city's contractual ability and constitute no surrender of authority or delegation of municipal power. These need not be noticed. We are particularly concerned with the restrictions undertaken to be placed upon the city council and the city utility commission in whom the statute confers the "absolute and exclusive control" of the system and its operation.

1. Annexed to and as a part of the contract is a schedule of rates to be charged the customers of the city. It establishes what is called a "demand charge," prescribes how it shall be measured, and how adjusted; likewise the minimum monthly charges. It sets up the classification of use and users of electricity, with varying specified rates to be charged. It provides that these rates may be changed or modified by the City Utility Commission and additional schedules adopted by it "with the approval of the Authority (TVA), which approval shall not be unreasonably or arbitrarily withheld or delayed." If the rates and operations be found not sufficient to maintain the system as prescribed by Section 3480d-9, Kentucky Statutes, the Utility Commission shall, "with approval of the Authority, make such increase or change in rates as will provide for the increased revenues necessary to place the system upon a self-supporting and financially sound basis; and the approval of Authority to such increase or charges shall not be unreasonably or arbitrarily delayed or withheld." The application to be made of the revenues from those rates is minutely set forth, but it is not substantially different from that prescribed by the statute.

2. Another component exhibit entitled "Schedule of Terms and Conditions" deals in detail with the active operation and management of the system by the City Utility Commission. Where alternative methods are stated the choice is "at the option of the Authority." It reserves the right to inspect all installation of equipment and to reject any wiring or equipment "not in accordance with the Authority's reasonable standards." The contract prescribes that the Utility Commission shall keep books of accounts prepared by the Federal Power Commission and used by other munici-

palities purchasing electric energy from the Authority. These books are subject at all times to inspection. The City must furnish financial statements relating to its system's operations as may be reasonably required by the Tennessee Valley Authority. The maximum return on the City's investment is limited. The City is required at the close of each fiscal year to publish a statement of its financial condition and operation of the plant. It is stipulated, "The provisions of this schedule may from time to time be changed or supplemented by agreement of Municipality and Authority."

3. Another appendix to the contract consists of detail rules and regulations for the adoption of the City Utility Commission. That commission undertakes to bind itself not to change the methods of operation prescribed therein without giving ten days' written notice to the Authority. This schedule relates to such matters as forms of application of consumers, billing of accounts, service charges, deposits to guarantee payment of bills, character of service rates, equipment, etc., inspections, meter tests, etc.

The contract further declares: "The several provisions of this contract and of the schedule of rates and charges are of the essence of this contract."

If it be said that the City of Middlesboro, through its Board of Commissioners and Utility Commission, by this contract has but exercised its discretion in adopting the plan to operate its plant (as it did by a separate order) and in establishing the rates stipulated, it cannot be denied that at the same time the City has surrendered the further exercise of its discretion for a term of 20 years, except by and with the approval of the federal agency. In every material respect the contract permits the T. V. A. to say how, when and where the City shall carry on its business of distributing electricity to its citizens and to itself for municipal purposes. The City has undertaken to bind itself for this long period of time not to change the method of conducting its business nor to modify the schedules of service and rates or the rules and regulations pertaining thereto, except it first secure the permission and approval of the federal agency. If those rates shall prove not sufficient to liquidate the bonds and maintain the plant with desirable or needed improvements or extensions, the City's hands are tied and can be loosened

only by the T. V. A. The City has undertaken to restrict its disposition of the revenues and to limit the income which it may deem a fair return on the investment.

The contract seems to build an obstacle to the right of bondholders to enforce their lien on the plant by compelling the collection of sufficient rates, as provided in Section 3480d-7 of the Statutes, or by having the property operated by a receiver appointed by the court. This is so because by its joint control the Tennessee Valley Authority would be a necessary party to the suit, and as an agency of the federal government (16 U. S. C. A., Section 831 et seq.; Tennessee Elec. & Power Company v. Tennessee Valley Authority, 306 U. S. 118, 59 S. Ct. 366, 83 L. Ed. 543) it is not subject to the jurisdiction of the state courts. It is free from the state's regulation or control. Posey v. Tennessee Valley Authority, 5 Cir., 93 F. (2d) 726. Thus the contract might be invoked to tie the arm of the state judiciary. Moreover, it would hamstring the legislature, for it could not change the statute in any way that would impair the obligation of the contract. Section 19, Constitution of Kentucky.

Public office is a public trust and it is fundamental that the performance of the trust cannot be farmed out or delegated to one not chosen directly or indirectly by the citizens, and then only under permission of the legislative body which established the trust. A city cannot go beyond its charter, nor its officers step aside that their functions may be performed by or their administration shared with others. Kluemper v. Zimmer, 240 Ky. 225, 41 S. W. (2d) 1111.

Though a municipal corporation in maintaining a plant for the distribution of electricity to its inhabitants for domestic use acts in a quasi-private and not a governmental capacity, and in that relationship the officials are regarded as administrative agents rather than public officers (19 R. C. L., 1132), nevertheless they are entrusted with responsibilities and duties that cannot be surrendered or delegated in whole or in part except as may be expressly or impliedly authorized by the law governing the performance of those duties. Cf. City of Mayfield v. Phipps, 203 Ky. 532, 263 S. W. 37. Municipal corporations as instrumentalities of the state have only such powers as have been granted by the legislature, expressly or necessarily implied. The grant itself

carries the prohibition of exercising any authority in excess thereof or in a manner different from that permitted. Booth v. City of Owensboro, 274 Ky. 325, 118 S. W. (2d) 684, 686. In that case we held ineffective a contract which provided for the joint control and operation of a hospital by the city, the county and a private association. We found it competent under the Statutes for the city and county to unite in the service, but held that a private concern could not be taken into partnership in conducting a public enterprise. "Doing so," said the opinion, "is to surrender official responsibility and to delegate the public function to persons who are not responsible to the people. The officers of a municipal corporation cannot so delegate the governmental discretionary authority confided to it by the legislature." The decision is supported by many cases. The several statutes authorizing the operation of a hospital by a city of the third class and a county, cited in the opinion, are not as restrictive as the statute authorizing the operation of an electric light and power system by such a city under the revenue-payment plan, which is that its utility commission, subject to the duties specially vested in the city council, "shall have absolute and exclusive control of said electric light, heat and power plants and its operation and fiscal management, regulation of rates and in every other respect." When the contract and the statute are placed in juxtaposition, it is manifest, we think, that there is a surrender of that control to the T. V. A. Any and everything that the city may wish to do in relation to the management is subordinated to the will of the federal agency. True, it has agreed in respect of modifying or changing the resale rates for current—but in that respect only—that it will not exercise its veto power unreasonably or arbitrarily. But the promise is abortive, for the Authority would be the sole and final judge of the reasonableness of its action.

It is submitted by the appellants, in connection with a phase of the case we have found not necessary to decide, that since the Tennessee Valley Authority is a governmental agency, having as one of its purposes the supplying of electricity to the public as cheaply as possible, it should not be regarded as a private corporation would be; that the relation between it and the City is, in the words of Justice Holmes, "if not paternal, at least

avuncular.'' The Authority does partake of the nature of the proverbial "rich uncle," but in its practice of benevolence, as is well-known, it is engaged in vigorous competition with private industry. It is so in this case. There is nothing in the laws of Kentucky that gives such an agency a special or preferred status. In considering questions of surrender or delegation to a federal agency of a discretion vested in public officers, it is held quite generally that the relation is no different than would be the relation of an individual or private corporation. As stated in Arkansas-Missouri Power Company v. City of Kennett, 8 Cir., 78 F. (2d) 911, 922:

"Were it not for the fact that the United States is financing the project, we do not believe it would even be suggested that a city could enter into any such arrangement with a lender of money, a buyer of bonds, or even a giver of gifts. The government, in lending its money and making its grant to the city of Kennett, is not acting in the capacity of a sovereign. The city derives none of its powers from the United States. It is a creature of the state of Missouri and has only such powers as the state has given it. The relation of the United States to the city is no different than would be the relation to it of any individual, corporation, foreign state, or foreign sovereignty which had made a similar arrangement for financing the city with respect to the construction of public works. If the city could lawfully enter into this agreement with the United States, we think it could lawfully have entered into a similar agreement with any entity having power to contract."

See also Illinois Power & Light Company v. City of Centralia, D. C., 11 F. Supp. 874; Aquamsi Land Company v. City of Cape Girardeau, Mo. Sup., 142 S. W. (2d) 332; Cf. Lower Colorado River Authority v. McCraw, 125 Tex. 268, 83 S. W. (2d) 629.

The appellant relies on Estes v. State Highway Commission, 235 Ky. 86, 29 S. W. (2d) 583, 589. The case involved the validity of the issuance and sale of revenue bonds for the acquisition or erection of a number of bridges. One branch of the case related to a contract between the Commonwealth of Kentucky and the State of Indiana providing for the erection of a bridge across the Ohio River by Indiana and the purchase of

an interest in the bridge by Kentucky by the payment of one-half the cost out of tolls. The contract stipulated that the rates and classification of tolls should be fixed by the Kentucky State Highway Commisison, subject to the approval of the Indiana Highway Commission. In the course of the opinion it was observed that there was no reason to believe that the Indiana Commission would refuse to give its approval, "and certainly there could be no arbitrary refusal." The point decided was "The bonds so issued will not be invalid because the Indiana highway commission must approve the rates and classification of tolls fixed by the Kentucky state highway commission." There is a difference in the conditions which called for the observation in the opinion and which produce the question now before us. The State Highway Commission was and is an agency of the state, but its authority is administrative and not legislative like that of a city. The statutes establishing the scheme of acquiring bridges by the state contained the essential power to make such contract, if not expressly then by necessary implication. Sections 4356s-6, 4356s-22, 4356sa-3. Certainly there was no such affirmative qualification as is contained in Section 3480d-20 declaring that the absolute and exclusive control of a municipal electric plant shall be confined to a local municipal body. In that case the contract was collateral and subordinate to the question decided. Not so, the contract at the bar; nor the particular provision as to approval of another sovereign, declared to be of the essence of the agreement.

While the general purpose of municipal ownership of an electric power plant and that of the federal agency is the same, viz: to render public service economically, and in order to attain that end there should be loyal co-operation in the execution of a contract providing for the joint control, or, to speak more precisely, for restrictive supervision by the seller of the electric current, yet, it cannot be assumed that such co-operation will be continued during the period of twenty years. It cannot be assumed that the right given in the contract to withhold approval of what the municipal government might desire to do will not be exercised, or that the power so reserved as a consideration for entering into the contract will not be used when there arises a difference of opinion between the officers of the Tennessee Valley Au-

thority and the officers of the City of Middlesboro as to the need or desirability of changing the system or its operation, including the rates to be charged for the service. As we recently said in Town of Jamestown v. Allen, 284 Ky. 347, 144 S. W. (2d) 807, 808, decided November 8, 1940:

"It is under this guise that arbitrary power is most frequently exercised, and the evil sought to be guarded against by the law * * * is not to be measured by the probabilities of the exercise of the power conferred, or the motives inspiring its exercise, but is inherent in the existence of the power."

The conclusion of the whole matter is that to place the judicial stamp of validity on the contract involved would be to confirm the voluntary abdication of power with which the legislature has clothed the City of Middlesboro. It would be to approve the assumption or acceptance by the City of complete subjectivity to the domination and control of the federal government through its agency in the management of the City's business without legislative sanction thereof. McGuinn v. High Point, 217 N. C. 449, 8 S. E. (2d) 462, 128 A. L. R. 608. A similar contract between the City of Memphis and the Tennessee Valley Authority was held not to involve a delegation of a governmental function but of a proprietary or private discretion and that such a contract was expressly authorized by a special act of the legislature of Tennessee. Memphis Power & Light Company v. Memphis, 172 Tenn. 346, 112 S. W. (2d) 817. Until the legislature of Kentucky shall speak an authoritative word, we are of opinion that the making of such a contract as that before us is ultra vires.

The revenue bonds were issued and sold without competitive bids, as we held in Eagle v. Corbin, supra, could not be done. But we also declared that in view of the previous construction of the statute under which bonds had been issued and contracts made, the new interpretation of the Act would not affect rights theretofore acquired. These bonds were issued and sold some time before that opinion was delivered, hence the objection to them on this account is not well taken.

The judgment is affirmed.

Whole Court sitting except Judge Perry.