## Louisville Tobacco Warehouse Company v. Louisville Water Company.

(Decided February 2, 1915.)

Appeal from Jefferson Circuit Court (Common Pleas, Second Division).

1. Public Service Corporations—Water Companies—Notice.—In the case of a public service water company it is a reasonable rule to refuse service if, after notice, a water bill remains unpaid. In such event, however, it is liable in damages if the bill rendered is unjust or erroneous.

2. Public Service Corporations—Deprivation of Service—Damages. —The consumer deprived of service for non-payment is not entitled to recover damages, if the bill rendered was just and correct although he may have refused payment because he in good faith believed it was unjust and exorbitant.

3. Public Service Corporations—Water Companies—Evidence.—It was not prejudicial error for the court to reject as evidence certain receipted water bills, when their effect was only cumulative, and they could have demonstrated nothing more than certain facts already established and virtually admitted as true.

HUMPHREY, MIDDLETON & HUMPHREY for appellant.

A. J. CARROLL for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

This case started in the Quarterly Court of Jefferson county. The water company filed a petition in that court seeking to recover from the warehouse company the sum of $177.47, claiming that it had furnished the warehouse company the quantity of water which, according to its rates, was of the value mentioned.

The warehouse company filed an answer and counter-claim, denying that the quantity of water mentioned in the petition had been furnished, and setting up affirmatively that the bills for the period in controversy were unusually large and exorbitant; that it had offered to pay the amount of an average bill; that the water company had refused to accept this amount and had wrongfully and illegally shut off the water from the warehouse company's hydraulic elevator; that by reason of this it was unable to operate its elevator, and that its business was damaged to the extent of $1,000.

On motion the case was transferred to the Jefferson Circuit Court, and in due time a reply was filed traversing all the allegations of the answer and counterclaim. With the issues thus joined, the case was tried and submitted to a jury and their finding was in favor of the water company for the amount claimed in the petition. On this appeal, the warehouse company asks a reversal upon the following grounds:

"1. That the court erred in refusing to allow the warehouse company to introduce in evidence its monthly water bills for six or seven months directly preceding the period in dispute.

"2. That the court erred in refusing to instruct the jury that if a bona fide dispute, based upon reasonable grounds, existed between the water company and the warehouse company as to the correctness of the bills rendered, the water company had no right to shut off the water from the warehouse company during this dispute."

The following are the facts out of which the controversy arose: The warehouse company used a hydraulic elevator in its tobacco house. The water by which the elevator was operated was furnished by the water company through a special meter, that is, a different meter from the one used to register consumption of water elsewhere about the plant. The tobacco house was several stories high, and the business was handling and storing tobacco on the various floors, so that it was very necessary to keep an elevator in service to move the hogsheads up and down as the occasion might require. The meter in use up to the time this trouble began was installed about 25 years prior thereto. The evidence for the water company shows that the meter was old and worn out and was not registering correctly. This fact

was revealed by the water company's inspector, and, thereupon, in July, 1912, it was taken out and a new one put in its place. The evidence of the water company as to the inefficiency of the old meter is not controverted. For the six months preceding this change the elevator water bills had ranged in amount from $3 to $14 per month, or an average of about $8. These facts are shown by avowals made by the warehouse company in an attempt to introduce as evidence receipted water bills for these months.

The bill for the first month after the new meter was installed, July 19th to August 19th, was $128.28, and it showed a water consumption of 1,063,656 gallons. For the next month the bill rendered was for $49.19 on a consumption of 342,548 gallons. These bills were so extraordinarily large that the warehouse company refused to pay them. They are the ones embraced in the petition filed in the quarterly court. The bill for the third month was down to "normal," to use a term of the warehouse company; that is, for 39 days there was a charge of $11.52 on a consumption of 102,476 gallons. The warehouse company refused to pay the two large bills because it claimed they were excessive and erroneous. The last bill, $11.50, was settled some time before the suit was filed. Upon refusal to pay the two bills in question, and after notice, water service was cut off from the elevator by the water company. This was pursuant to one of its rules.

When the water company's inspector read the new meter at the end of its first month's service, it was noted that the registered consumption was unusually large. Four days later another inspector was sent to re-read the meter and verify the first report. He ascertained, as he testified, that the first reading was correct, and that, in addition, 17,600 gallons had been consumed in the four days between the two readings. The water company then, pursuant to a custom, sent written notice to the warehouse company that the amount of water shown to have been delivered through the meter was so large as to indicate a leak at some place in the warehouse service pipes or in the elevator. On August 19th, the bill for $128.28 was rendered. This, together with the warning of the leak, caused the warehouse company, on August 28th, "to have its plumbing and hydraulic elevator examined so that any needed repairs

could be made." The testimony of the plumber shows that the pipes leading from the meter to the elevator were in good condition and free of leaks. As to the elevator, they say there was some seepage, but it was of no consequence. We understand from the record that the seepage referred to by the plumbers is such as is found with all dydraulic elevators, and it does not serve to account for any material part of the water registered. But it is also shown from the testimony of the plumbers that they repaired two water valves in the elevator chamber; that is, the leather cups in the inlet and outlet valves had been in service long enough (8 or 10 months) to need new ones in their place, and new ones were put in. They say that there was no leak around these old leather cups, and that they put in the new ones merely because it was getting time to renew them, and it was then convenient to do so. But their testimony as to the improbability of a leak at these valves is weakened when they show the improbability of a leak being discovered by them. In making the repairs to the valves the water was necessarily cut off from the elevator. There being no water or pressure, no leaks would be apparent. In this, the second month, the elevator was operated for ten days with the old valves and 21 days with the new ones, and we find the water consumption recedes from $128.28 to $49.19. During the next month the expense of service with the new valves was back to $11, or "normal."

The warehouse company maintains that there was no leak in their service pipes or valves. It is contended that the trouble was in the new meter; that it was improperly adjusted when it was installed, and for this reason the excessive amounts were registered during the first two months. "Normal" registration in the third month is accounted for by argument that the new meter in course of time just settled down to good work, or was properly adjusted by the water company inspectors when they were making some of their frequent readings. The water company contends that the new meter at all times registered correctly. To sustain this position, it relies upon the three or four inspections it caused to be made of the meter during the two or three months in question, and also the fact that as soon as the warehouse company renewed the valves in the elevator the registered water consumption was satisfac-

tory to both parties. The water company argues that the repair of the elevator valves and the normal registration afterwards shows beyond controversy that there was a leak in the elevator. From the evidence it appears that the elevator was operated by water under 70 pounds city pressure—that when the inlet valve was opened into the elevator chamber the elevator platform was raised by the water pressure. When the outlet valve was opened the water was released into the sewer and the elevator platform was thus lowered. The proof shows that a leak the size of the lead in a pencil in one of these valves will, during a month, under 70 pounds pressure, show a consumption equivalent to that charged for in the first bill. But the warehouse company argues that unless there was a leak of the same size in the outlet valve the elevator platform would not remain stationary. It proves that the elevator platform never gave any trouble on this score, and that an identical leak in both valves is a coincidence too unlikely for consideration. The facts in evidence amply justify the argument of both parties, and it is not insisted that the court erred in submitting the case to the jury. The lower court took the view that the main question was whether the water company had delivered to the warehouse company the quantity of water shown by the meter.

The following instructions were given:

"1. If you believe from the evidence that the plaintiff, the Louisville Water Company, furnished to the defendant, the Louisville Tobacco Warehouse Company, from July 19th to August 19th, 1912, 1,063,656 gallons of water, and from August 19th to September 19th, 1912, 342,584 gallons of water, then the law is for the plaintiff and you should so find. But, unless you so believe from the evidence, then the law is for the defendant, and you should so find.

"2. If you find for the plaintiff as against the defendant, you should award it the sum of $128.28 and the further sum of $49.19.

"If you find for the defendant you will award the defendant as against the plaintiff such sum in damages as you may believe from the evidence will fairly and reasonably compensate it for any loss of business growing directly out of the shutting off of the water by the plaintiff, the whole award not to exceed the sum of $1,000, the amount claimed in the counter-claim."

Aside from the errors complained of, and which we shall presently discuss, we may remark that instruction No. 1 was more than fair to the warehouse company. In effect, the jury were told that the water company could not recover anything unless the jury believed it had delivered the exact number of gallons mentioned in the instruction.

But the warehouse company insists that the lower court misconceived the issue. Its contention is that, although the water company may have delivered the quantity of water registered by the meter, yet, if the quantity was so large and unusual as to raise suspicion, it constituted reasonable ground for resisting payment; and if, in fact, there was a bona fide dispute as to the correctness of the bill, then the water company, although the bill was correct, had no right to shut off water from the warehouse company during the dispute. The court refused to give the two instructions quoted below, which appellant offered as embodying its view of the law:

"2. Even if you believe from the evidence that there was such a leak in the elevator as required the use of 1,063,656 gallons of water from July 19th to August 19th, and 342,584 gallons from August 19th to September 19th, yet, if you believe from the evidence that the defendant was disputing with the plaintiff as to the correctness of the quantities of water and the bills rendered, and, furthermore, that such dispute was based upon reasonable grounds, the court instructs you that the plaintiff had no right to cut off the supply of water from the defendant's elevator; and if you believe that the plaintiff did so cut off this supply of water, the law is for the defendant on its counter-claim, and you shall so find.

"4. If you believe from the evidence that at the time the plaintiff cut off the water from the defendant's elevator the defendant was engaged in a bona fide dispute with the plaintiff as to the correctness of the water bills, and if you believe further that such dispute on the part of the defendant was based upon reasonable grounds, then the court instructs you that the plaintiff had no right to cut off the water from defendant's elevator, and the law is for the defendant on its counter-claim and you shall so find."

Public service corporations having the right of eminent domain, or exercising the use and occupation of

streets or highways, whether along or under them, in a manner not permitted to the public generally, are privileged to make and enforce reasonable rules for the conduct of their business. But within such rules they owe to every member of the public the same character of service—that is, service on equal terms and without discrimination. For instance, a common carrier may refuse to accept passengers or to carry freight if the fare or rate is not paid or offered to be paid at the time which has been fixed by established and reasonable rules. But if the passenger or package does not conform to such rules then service may be refused. Always, however, when the corporation passes judgment on its own case, it does so at its peril. In other words, it must be right, otherwise it is liable in damages to the injured party. In fact, as to all parties, when one elects to stand upon his rights it behooves him to be right.

It must be conceded, therefore, that a public water company may cut off its service for failure on the part of the consumer to pay the charges, that being a reasonable rule and regulation. Cox v. City of Cynthiana, 123 Ky., 363; 40 Cyc., 804. But we quite agree with counsel for the warehouse company that there is a limitation on this principle. For instance, a water company may not deliberately or erroneously make out an excessive bill, and, for failure of the consumer to pay it, cut off the service, without becoming liable for such damages as the consumer may sustain by reason of its arbitrary and wrongful action. The water company, like any other vendor of an article for public or private consumption, has recourse to the courts for the settlement of disputed bills, but, in view of the fact that it does not choose its patrons, and it owes a service to the public, and all of the public are entitled to that service by paying for it, it is the generally accepted rule that in addition to having recourse to the courts, the water company may enforce payment of its lawful charges by shutting off the water from particular premises, and it may refuse to furnish water until its bills are paid. But, when it adopts the latter and more drastic remedy, it must be correct in the amount and manner of its demand. In a suit for damages resulting from shutting off the water, it is therefore competent to attack the correctness of the demand, and, if it is shown to be wrong, the water company should pay the damage which it has

inflicted by thus taking the law into its own hands and becoming judge of its own case.

On the other hand, the consumer has no right to demand continued service when he refuses to pay merely because he believes the bill is exorbitant, or because he in good faith disputes the correctness of it, even though there are reasonable grounds for the dispute. He has ample remedy to protect himself against extortion or damage or loss of service. As above stated, he may recover damages if it appear that he has been deprived of service for refusal to pay an unjust bill, or he may keep the service by paying under protest the bill rendered and sue to recover the excess, or he may execute bond and enjoin the water company from shutting off the service until the dispute is terminated.

In support of its position the appellant cites the following cases: South Carolina Pool v. Paris Mountain Water Co., 86 S. C., 436, 62 S. E., 874; Wood v. City of Auburn, 87 Me., 287, 36 Atlantic, 906; State v. Kinloch Tel. Co., 67 S. W. (Mo.), 648; Borough of Washington v. Washington Water Co., 62 Atlantic, 390 (N. J.); Benson v. Paris Mt. Water Co., 88 S. C., 351, 70 S. E., 897.

All of these cases were equitable proceedings for injunction or mandamus. They recognize the right of a consumer or municipality to resist the payment of an unreasonable price, or an excessive bill, and say that an injunction will issue to prevent the water company from terminating the service, or mandamus to compel the service. But, in such cases, where service is so coerced, the company is protected, for the complainant is under bond to secure the company in the payment of such rate and amount as may be determined proper in the course of legal proceedings.

We have reached the same conclusion entertained by the lower court, and that is, that there was but one question in this case, and that was whether the bill rendered was correct. The warehouse company elected to waive its right to mandamus. It sued by counter-claim for damages. As before stated, we are of the opinion that the warehouse company did not show a right to recover damages from the mere fact that the dispute, so far as it was concerned, was bona fide. In a civil proceeding the party in error is not saved the cost and consequence of his error by a show of good faith. It had no right to recover unless the water company was in the

wrong, that is, had presented and demanded payment of an unjust bill, and attempted to coerce payment of it by refusing water service. The court submitted the case to the jury with instructions to find whether the water company was in the wrong; that is, whether it did not supply all of the gallons of water it charged for; if it did not they were told to return their verdict for the warehouse company. And, in such event, they would also find for the warehouse company such damages as it sustained by being thus wrongfully deprived of water service.

The next question comes from the refusal of the court to permit the warehouse company to introduce in evidence water bills for the six or seven months just preceding the period in dispute. These bills were made out from readings of the old meter. It is uncontroverted that the old meter was defective, if not dead, and that its registrations were incorrect. Nor is there any dispute about the fact that the bills made out after installation of the new meter were unusually large. That is, the charges for water consumed as shown by the new meter were excessive in comparison to the charges during the preceding year, or as gauged by what the elevator ought to consume.

Mr. Kremer, the chief assessor for the water company, and the first witness introduced by it, says, with reference to this first bill: "There was a large excess over the preceding month." Neither is there any dispute about the good faith of the warehouse company in contesting them. The bills for water service registered by the old meter could have demonstrated nothing more than the above conceded and uncontroverted facts. We do not believe it was error to reject them under the circumstances of this case.

For these reasons the judgment of the lower court is affirmed.