## City of Middlesboro v. Kentucky Utilities Co.

(Decided April 25, 1934.)

ARTHUR RHORER and LOW & BRYANT for plaintiff.

W. E. CABELL, J. E. SAMPSON, N. R. PATTERSON, and GORDON, LAURENT & OGDEN for defendant.

OPINION BY JUDGE DIETZMAN—Dissolving injunction in part and modifying in part.

This action is before me on motion to dissolve a temporary injunction granted by the lower court. The facts of this case are these:

The defendant, hereinafter called the company, has furnished electric service for more than 20 years, and water service for more than 15 years, to the plaintiff, hereinafter called the city, and its inhabitants. For more than 10 years prior to January, 1931, it has been the custom of the city to pay for the services furnished it in lighting its streets and municipal buildings and in supplying water to those buildings and to its fire hydrants by promissory notes in anticipation of tax collections. These notes had during that period been promptly paid at maturity. On January 31, 1931, the city owed the company slightly in excess of $13,000 for

water and electric service furnished theretofore. In February, 1931, the city paid a small part of that indebtedness in cash, and for the balance executed two promissory notes for $6,000 each. One of these notes was eventually paid and $2,000 was paid on the other note. In January, 1932, the city owed the company for electric and water service furnished during the period from February 1, 1931, to December 31, 1931, $10,833.61, for which the city executed its note dated January 29, 1932, payable six months after date. This note was executed pursuant to a resolution duly adopted by the board of commissioners of the city. At the maturity of that note, it was renewed for an additional period of six months. No part of that note has ever been paid. During the summer of 1932, no payments having been made on account of current bills and no payments having been made on the past-due indebtedness as above set out, a conference was had between the officers of the company and the board of commissioners of the city. The company was taking the position that it could not and would not continue to furnish service to the city unless the city should make satisfactory arrangements to pay or secure the payment of the past-due indebtedness and to pay current monthly bills. The board of commissioners assured the officers of the company that a plan would be worked out whereby the past indebtedness would be paid and current bills would be promptly discharged. Relying on this assurance, the company allowed the matter to drift for several months. The city, however, did nothing, and it was again sharply warned by the company that unless some action was taken the company would be compelled to discontinue service to the city. The service to the inhabitants is not in controversy in this litigation. The board of commissioners on receipt of this notice agreed to take care immediately of at least one-half of the indebtedness which at that time had grown to about $28,000, and at a meeting of the board on November 15, 1932, it adopted a resolution, by the terms of which the city pledged $14,000 of revenues due from certain specific sources to be applied on account of the existing indebtedness due the company. Of this $14,000, $3,000 was due by the company as part of the taxes of that company payable to the general fund of the city. In accordance with the resolution, this $3,000 was applied to the past-due in-

debtedness, and this is the only money that has been paid on that indebtedness since a payment of $3,500 in September, 1931, and a payment of $104 in May, 1933. Not only did the city make no effort to pay its current bills and make no effort to arrange to take care of the $14,000 of past-due indebtedness, which was not covered by the pledge of revenues under the resolution of November 15, 1932, above mentioned, but it made no effort to collect the revenues which were pledged under that resolution. A letter from the city attorney to the company in June, 1933, indicated that although the city had theretofore been derelict in making any effort to collect these pledged revenues, such effort would be made by the September term of the Bell circuit court, but as a matter of fact none was made nor has any ever been made. In September, 1933, the company filed suit against the city to recover the indebtedness due it for service rendered up until August 31, 1933. The city filed an answer and counterclaim in which it defended on the grounds: (a) That the service had been rendered under a verbal contract not advertised and let in accordance with section 3440 of the Kentucky Statutes; (b) that at the time the notes were issued the city had already exceeded the indebtedness allowed it under section 158 of the Constitution; and (c) that at the time the notes were issued, the income and revenue for the year had been appropriated to other purposes. By its counterclaim, the city sought a judgment against the company in the sum of $5,000 a year for 10 years for the privilege of the use of the public ways of the city. Up to the decision of this court in the case of City of Middlesboro v. Kentucky Utilities Co., 237 Ky. 523, 35 S. W. (2d) 877, it was thought that the company had a franchise to do business in the city of Middlesboro. However, that case decided that the company had no such franchise. It was because of such lack of franchise that the city sought a judgment for the use and occupation of its streets by the company during part of the period it thought it had a franchise. When the mandate of this court in that case was entered in the circuit court, the judgment by agreement provided that on six months' notice the company should remove all of its wires, poles, pipes, and other property from the streets of Middlesboro. No such notice has been given up to the time of the filing of this suit. The filing of

this answer and counterclaim was the first notice or intimation that the company had that the city proposed to repudiate the debt which it had theretofore consistently recognized as a just obligation. This answer was filed on November 17, 1933. A new board of commissioners of the city having just been elected at the November election, the company took no action after the filing of this answer and counterclaim with the thought that perhaps the new board would not take the same position with regard to this indebtedness as had the old board. The company was soon disillusioned. In January, 1934, the company, in connection with other matters, wrote a letter to the city calling the attention of the city to the amount which the company alleged was due it by the city, and asking for an adjustment of the indebtedness. The board ignored this communication. On February 6, 1934, there was introduced in the board and given its first reading an ordinance authorizing the mayor and clerk to execute a loan agreement between the United States government and the city, whereby it was proposed that the Public Works Administration would loan the city the sum of $328,000 for the purpose of constructing a municipal electric plant on condition that the city at once compel the defendant to remove all its property from the streets in accordance with the judgment as to its franchise above mentioned. Thereupon the company notified the city that on February 17th, it would discontinue furnishing electric and water service to the city (as above mentioned, service to the inhabitants is not involved in this litigation), unless the indebtedness alleged to be due from the city in the then amount of $35,736.15 was satisfactorily adjusted. By reply the city offered to post bond for the payment of future bills, but said nothing as to the past-due indebtedness. This offer was conditioned on the proposition that the amount of taxes then due from the company, and which would be allocated to the general fund of the city, should be applied to bills for future service, and to that extent the bond be relieved. The amount of taxes then due the general fund was $2,627.47. Insisting that these taxes should be applied to past-due bills, and being unwilling to continue to furnish service to the city until this whole matter of past-due indebtedness was satisfactorily adjusted, the company declined to accede to the city's offer, and thereupon the city brought this suit

to enjoin the company from discontinuing the electric and water service to the city as the company had threatened to do. Inter alia, the petition expressly averred that the company had no franchise to do business in Middlesboro. After a hearing which brought out the facts as above indicated, the court issued a temporary injunction enjoining the company from discontinuing water service to the municipal buildings and fire hydrants and the lighting service to such buildings and for street lights on condition that the city pay to the company in advance the rates theretofore charged by the company for such service, and that the city execute to the company a bond to pay the company whatever might be adjudged to be due it for service for the months of September to December, 1933, inclusive, and for the month of January to the 17th day of February, 1934. Nothing was said about the indebtedness which had been incurred prior to September, 1933. It is this injunction which I am asked to dissolve.

The anomalous position taken by the city is at once apparent. The defense which it has to the suit for the alleged past-due indebtedness is that such indebtedness was illegally incurred in that not only did it violate constitutional inhibitions as to indebtedness, but also that there was no binding or legal contract under which the indebtedness could be incurred, and further because the company has no franchise in the city to furnish this service. Yet the city now undertakes to compel the company to furnish this service under the very terms and conditions which it says are illegal. The city cannot blow both hot and cold. This case is controlled by the cases of City of Winchester v. Kentucky Utilities Co., 182 Ky. 144, 206 S. W. 296, 297, and Board of Education of City of Somerset v. Kentucky Utilities Co., 231 Ky. 484, 21 S. W. (2d) 817. In the Winchester Case, the city of Winchester undertook to terminate the franchise which the utilities company had on the ground that it had been forfeited because of the violation of one of its conditions. At the same time it refused to pay for street lighting service furnished during the months of August, September, and October of 1918, upon the ground that the company had during the existence of the franchise grossly overcharged the city for electric service furnished street lights. The company thereupon notified the city that unless these lighting bills were

paid it would discontinue the street lighting service on
November 1st. The bills were not paid, and the com-
pany discontinued the service. Thereupon the city of
Winchester filed an injunction suit, asking that the com-
pany be required to continue to furnish this street light-
ing service. A temporary injunction granted by the
circuit court was dissolved by Judge Miller of this
court, with whom the whole court sat. In his opinion,
it is said:

> "It will be observed that the city occupies the an-
> omalous position of seeking to specifically enforce
> a contract which it has terminated pursuant to an
> express power given by the contract."

We may parenthetically state that in the instant
case the city of Middlesboro is seeking to require the
company to furnish service in accordance with a con-
tract which the city expressly alleges is illegal and
under a franchise, the existence of which the city rightly
denies. In the Winchester Case, Judge Miller stated
that under such circumstances equity will afford no in-
junctive relief to the party who seeks to enforce a con-
tract which he expressly alleges to be illegal. It was
pointed out in the Winchester Case that courts generally
recognized the right of a public utility company to dis-
continue its service when the customer declines to pay
therefor, which right is cumulative to the right of the
company to sue for pay for the service which the cus-
tomer has declined to pay. See, also, Cox v. City of
Cynthiana, 123 Ky. 363, 96 S. W. 456, 29 Ky. Law Rep.
780. The city of Middlesboro stands on no better ground
in this regard than any other customer. The court in
the Winchester Case further said:

> "On the other hand, a water company or light-
> ing company may be enjoined from discontinuing
> its service on a failure of the customer to pay a
> bill which he, in good faith and upon reasonable
> grounds, disputes. These principles were recog-
> nized in the late case of the Louisville Tobacco
> Warehouse Co. v. Louisville Water Co., 162 Ky.
> 478, 172 S. W. 928, where the court said:
>
> > " 'It must be conceded, therefore, that a public
> > water company may cut off its service for failure
> > on the part of the consumer to pay the charges, that
> > being a reasonable rule and regulation. Cox v.

City of Cynthiana, 123 Ky. 363, 96 S. W. 456, 29 Ky. Law Rep. 780; 40 Cyc. 804.'

"But, before a customer can obtain injunctive relief in such a state of case, he must offer to pay the charges which he concedes to be justly due. If he seeks equity, he must do equity. As was said in Bell's Trustee v. City of Lexington, 120 Ky. 199, 85 S. W. 1081, 27 Ky. Law Rep. 591. 'He must come, not only with clean, but with open, hands.' To the same effect, see McDaniel v. Springfield Waterworks Co., 48 Mo. App. 273.

"It is no answer to the application of this legal principle in this case to say that the company owes the city money for overcharges, since that claim is not only disputed, but is indefinite and unliquidated. And, since the city's monthly bill amounts to between $800 and $900 and the order of injunction requires the city to pay monthly the sum of only $400, it is plain that the order, to the extent of at least one-half of the monthly bill, undertakes to collect that much of the city's claim for overcharges, without a trial. And, in addition, no provision has been made for the August, September, and October bills, amounting to $2,700. We know of no rule of law that would justify this procedure. The court cannot make a contract for the parties.

"Furthermore, there is nothing in this case to justify the allegation of the petition that the city will suffer irreparable injury unless the injunction be granted, since the city had it entirely within its power to retain this lighting service—and that is all that is covered by the injunction—by paying the monthly bills. * * * There is no allegation that the company is insolvent, or that the city would be prejudiced in any way by prosecuting its ordinary action to recover the alleged overcharges.

"The fact that the plaintiff is a municipal corporation, serving the public by securing a lighting service for it, does not change the rules governing the construction of contracts. * * *

"And such is the case here. The city of Winchester passed a resolution canceling the contract with the company, thereby, at least, putting in jeopardy the company's right to recover for its

lighting bills; and, in now saying that its act in that respect was ineffectual, although it has never been rescinded, the city finds itself in the same position in which the buyers found themselves in Nash v. Page [80 Ky. 539, 44 Am. Rep. 490], supra.

"It is not now necessary to decide, nor do we decide, what was the effect of the city's resolution terminating the contract; we only decide that the city has placed itself in a position where it cannot, in good conscience, successfully appeal to the chancellor for the relief sought. There is no equity in the bill."

It is true in the instant case that the city is claiming by its counterclaim rental for the use of the streets during the past ten years, but as pointed out in the Winchester Case, not only is this claim disputed, but it is indefinite and unliquidated, and there is no allegation that the company is insolvent or that the city will be prejudiced in any way by being relegated to the prosecution of this unliquidated and indefinite claim for its recovery. But beyond all this, certainly the city cannot take the position that the company has no valid contract under which it can furnish service to the city and then collect therefor and so escape paying past-due indebtedness, and yet at the same time insist that the company shall be compelled to furnish service in accordance with the terms of that contract. In such state of case, the city comes not into court with clean hands, and there is no equity in its bill. It is therefore apparent that the temporary injunction herein granted was improvidently granted, and it must be dissolved. But in accordance with the principle of the Lexington and Ft. Thomas Cases, on motion to dissolve temporary injunctions requiring public utility companies to furnish service after the expiration of their franchises, which opinions are not published, the injunction will not stand dissolved until June 1, 1934, and then only as to the electric service. As to the water service, the company by its brief expressly stipulates that if the city will agree that the amount of taxes due by the company to the general fund of the city for the year 1933, to wit, $2,627.47, may be applied by the company to the past-due indebtedness for fire hydrant service, which amounts to more than $10,000, the company will agree to forego forever its

148

right to discontinue fire hydrant service for failure on the part of the city to pay for such service rendered prior to February 17, 1934, leaving the company only such remedy as it may have at law to recover the balance of such indebtedness, all this conditioned on the city paying in advance on the first of each and every month for the water service during the ensuing month for such water service so long as the city may desire it. The company states that it makes this concession in the interest of the public safety. Now, in accordance with this offer, if the city shall accept the same on or before May 25, 1934, the injunction with regard to the water service, modified in accordance with the terms of said offer, shall continue until further order of the court, but if the city shall refuse to accept such offer, then the injunction as to the water service shall also stand dissolved as of June 1, 1934.

The whole court, with the exception of Judge Thomas, who was absent, sat with me in the consideration of this case, and concur in this order.