**Carl F. HUFF, Appellant,**

v.

**ELECTRIC PLANT BOARD OF the City of MONTICELLO, Kentucky, and City of Monticello, Kentucky, Appellees.**

Court of Appeals of Kentucky.

March 8, 1957.

Leonard E. Wilson, Jamestown, Bruce H. Phillips, Monticello, for appellant.

Parker W. Duncan, Duncan & Huddleston, Bowling Green, for appellee.

STEWART, Judge.

The Monticello Electric Light Company sold its facilities for the distribution of electricity to the City of Monticello on January 20, 1954, and the city has henceforth managed the system through an agency known as the Electric Light Plant Board. We shall hereinafter refer to these parties as "the company", "the city" and "the board". As a part of the closing agreement, the city contracted with the company that it would collect its unpaid bills for electric current furnished and disconnect the service of a patron if his account was not paid. Carl F. Huff operated a sawmill near Monticello to which the company had supplied electric power, and Huff continued on as a customer of the city after the sale. Two bills for electricity, as shown by meter readings of December 15, 1953, and January 15, 1954, amounting to $177.05, were rendered to Huff on February 1, 1954, as an indebtedness owing the company. Huff on his own initiative deducted $75 from the debt and remitted the balance. He asserted the company owed him this sum, giving as a reason that one of his motors had been "burned out" due to low voltage allegedly caused by the company's negligence. His previous requests of the company for settlement for the ruined motor had been refused.

On February 24, 1954, Huff received a writing signed by the company notifying him that because of the nonpayment of a past due bill of $75 for electric power, his service would be disconnected. He refused to pay and his electricity was cut off three days thereafter by the board. Huff then installed diesel engines, being unable, as he testified, to obtain electric current elsewhere. Huff admits that, long before any controversy arose over the nonpayment of this bill, he wrote the chairman of the board advising that unless his rates were reduced he was going to revert to diesel power.

Huff instituted this suit against the city and the board, as defendants, to recover $25,000 damages which he claimed resulted from the wrongful and unlawful discontinuance of power to his sawmill, averring loss of profits and damage to his logs and timber. These defendants traversed the allegations of the complaint and then pleaded affirmatively their right to cut off the electric service under the city's contract with the former owner. They brought in by a third party complaint the company in order that they might recover of it any amount adjudged against them. The company denied liability and entered a counterclaim against Huff for the balance of $75 due on the delinquent account. Huff then instituted a claim against the company for $500 for damages incurred in closing down his plant because of its supposed negligence in furnishing power of too low voltage. The lower court directed a dismissal of the complaint as to the city and the board. The action in relation to the company's responsibility was abated pending final decision on this appeal of the initial case. Huff challenges the correctness of the judgment dismissing his claim.

Our first inquiry is whether the company would have had the legal right to cut off Huff's electric power had it continued the operation of the system, for if it did not possess this right, and its action was wrongful, it would follow that the city and the board would be liable.

■ It is the generally accepted rule in this jurisdiction that a public service company may adopt and enforce regulations providing for the discontinuance of its service to any customer who, after reasonable notice, fails to pay his bill. See City of Middlesboro v. Kentucky Utilities Co., 255 Ky. 140, 72 S.W.2d 734; Kentucky Utilities Co. v. Warren Ellison Cafe, 231 Ky. 558, 21 S.W.2d 976; City of Winchester v. Ky. Utilities Co., 182 Ky. 144, 206 S.W. 296; Louisville Tobacco Warehouse v. Louisville Water Co., 162 Ky. 478, 172 S.W. 928. This principle of law is based upon a sound public policy which recognizes that it would be highly impractical to compel a utility company to resort to an infinite number of actions at law to collect small accounts against scattered consumers. The only qualification of the rule is that the company may be liable for damages resulting from the disconnection of the current if the bill rendered is not just and correct.

■ It is not enough that a consumer may be convinced that the bill is erroneous or that it is exorbitant. Indeed he may in good faith believe these things, but if he is erroneous in his judgment and refuses to pay he may not recover damages because of the denial of service. See Kentucky Utilities Co. v. Warren Ellison Cafe, supra; Louisville Tobacco Warehouse v. Louisville Water Co., supra. The patron may not justify his refusal to settle the account by setting off against it a claim which is unliquidated or uncertain. See City of Winchester v. Kentucky Utilities Co., supra; Central Louisiana Power Co. v. Thomas, 145 Miss. 352, 110 So. 673, 111 So. 142; Barrett v. Broad River Power Co., 146 S.C. 85, 143 S.E. 650.

■ In the present case there was no dispute whatever between the parties over the correctness of the amount of the statement rendered. On the contrary, the demand made by the customer was based upon a claim of extraneous liability on the part of the company for damages to a motor

occasioned by the alleged negligence of the company. So, the question is whether a customer may arbitrarily adjudge his own claim to be well founded and collect it by way of an unliquidated and unadjudicated setoff against a legitimate charge for subsequent service. We think such procedure is unwarranted.

The case of Central Louisiana Power Company v. Thomas, 145 Miss. 352, 110 So. 673, 111 So. 142, is quite similar to the case at bar. Thomas operated a gin and gristmill by electric power. He deducted $56 from the sum rendered him for electricity, which amount he contended he had been damaged by a brief interruption in the current. The power company refused to recognize his claim and, upon the refusal of the customer to pay the balance of the bill, it cut off his power. In reversing a judgment of the lower court granting an injunction and allowing damages to the customer, the court held that a public service corporation cannot be denied the benefit of the rule which permits it to disconnect a patron for default in payment of an account because he presents a counterclaim for unliquidated damages. The court ruled that the consumer should have continued to pay his monthly bills and then should have brought suit for any damages he may have suffered by reason of the interruption in the electric current for his gin and gristmill.

We, therefore, conclude that the company would have been justified in cutting off the current had it been supplying the customer with the power at the time it did so. This leads us to the ultimate inquiry, namely, whether the successor owner and the operator of the electric system had the legal right to cut off the current to Huff's mill.

The board maintains that not only did it have the authority but that it was its duty to cut off the supply of electricity to Huff under its contract of purchase of the facilities. This contract obligated the city to "assist the seller (the company) in collecting its unpaid bills for electric service rendered prior to the closing date (of the contract), by cutting off electric service to delinquent customers of the seller, in the same manner as the buyer (the city) would do to enforce collection of its own bills." The same commitment was contained in another paragraph of the contract which provided that the board should "enforce collection, if necessary, by disconnecting the electric service connection of any customer who may wrongfully fail or refuse to pay any bill in the same manner as the buyer proposes to do in its own operation of the electric system."

■ It was of course competent for the city to contract to collect the bills of its predecessor. This proposition is not in controversy. However, the mere fact that the city was under a contractual duty to its predecessor or to anyone else to carry out this provision will not absolve it from liability if the performance of this undertaking results in a tortious act. Huff vigorously argues that even if the city's predecessor could discontinue his current, the city and its managing agency, the board, cannot do so. In other words, Huff would have us limit the cutoff rule very narrowly on the ground that such a drastic remedy should be very strictly confined.

Huff relies upon Johnson v. Carolina Gas & Electric Co., 106 S.C. 447, 91 S.E. 734, as authority for the position that the city wrongfully disconnected him from current under the circumstances. This is a South Carolina case which was decided in 1917 and it is mentioned in a note in 28 A.L.R., at page 494. In that case the successor water company cut off Johnson's water in his home and at his office building as a result of his failure to pay for the water used at the office building. The court there held that the water company was liable and presumably based its decision purely on the proposition that the cutoff remedy cannot be invoked by a successor company. However, the decision, because of the facts set out therein, could have been decided

on the generally recognized principle that the company cannot discontinue a debtor's water (or power) in one place because of his failure to pay a debt incurred therefor at another location. 43 Am.Jur., Public Utilities and Services, Sec. 71, p. 618. The later South Carolina case of Barrett v. Broad River Power Company, 146 S.C. 85, 143 S.E. 650, explained the Johnson case by indicating that the decision there turned on the point that Johnson's water could not be interrupted at his home by reason of his being delinquent in his water account at the office building.

The Johnson case represents the only opinion on the subject under discussion that we have been able to locate after a careful search. But even though it does to some extent bolster Huff's contention set forth above we are not constrained to follow it. The opinion is brief, scarcely half a page in length, and no basis whatever is advanced as to why the cutoff right cannot be invoked except the court's statement that it was unable to find any authority for permitting it to be done. Such reasoning would be persuasive if we adhered to the view that the law is a fixed, immutable body of rules, or, to use Mr. Justice Oliver Wendell Holmes' phrase, "a brooding omnipresence in the skies." But this Court, and most courts of today, have rejected such a static theory of the law, which is often labeled "mechanistic", and, instead, have chosen to follow the organic theory of the law. This latter theory assumes that the law grows, that changes in society engender corresponding changes in the rules of law governing that society. Therefore, we are not moved by the argument that we cannot decide a particular case in a certain way merely because no other court has ever determined the question raised.

If we are to hold as Huff urges, it would mean that one power company selling out to another would be deprived of the speedy, economical, "cutoff" method of collecting its final month's bills. The seller might have to resort to the costly process of su-

ing large numbers of persons for small amounts of money. Such a state of affairs would undoubtedly produce the result that the seller would demand a higher purchase price for an electrical system in order to offset the loss occasioned by the added expense of reducing these bills to cash. Furthermore, we cannot see any justice in permitting the delinquent consumer to invoke as a defense to discontinuance of his service the mere fact that the company he owes has been supplanted by a second company. The only problem here is for us to draw the line and determine whether the action under scrutiny lies on the permitted or on the forbidden side of that line. As far as any consumer of electricity is concerned his situation remains exactly the same and his substantial rights are not impaired one iota by allowing a successor to collect a utility account for a predecessor.

It has been suggested that if the first company had *assigned* its accounts payable to the successor company, then the second company would be justified in using the cutoff remedy, since then it would "have an interest" in the debts. However, we feel that to make such a distinction would be an undue sacrifice of substance to technicality. This would also require a successor company to assume the risk that the prior debts might be uncollectible, even if the cutoff remedy would lie, and result in an unrealistic approach to this problem. Incidentally, it might be added that the first South Carolina case discussed above dealt with the problem when there *was* an assignment.

Therefore, we conclude that the lower court ruled correctly in dismissing the appellant's complaint.

Wherefore, the judgment is affirmed.

BIRD and SIMS, JJ., dissenting.

SIMS, Judge (dissenting).

I find myself unable to agree with that part of the majority opinion which permits

the Board to cut off a customer's electric service for the nonpayment of a bill to its predecessor Company. I will succinctly state my view.

It must be admitted the Board has the right to cut off a customer's current for nonpayment of his bill. Were this not the law, it would be most difficult for public utilities to operate, as they have innumerable customers with small bills and cutting off the service for nonpayment of bills is the only practical way a utility can enforce collection thereon. However, this unusual remedy should exist only in favor of the utility whose customers actually owe it and the privilege should not be extended to one to which a customer is not indebted.

Furthermore, I am in accord with the majority opinion that the Monticello Electric Company and the Electric Plant Board had the right to enter into a contract whereby the Board would collect the unpaid bills for current furnished by the Company. But the provision in their contract that the Board would cut off the customer's current if he did not pay his bill to the Company cannot be binding on the third party, the customer. As I read Johnson v. Carolina Gas & Electric Co., 106 S.C. 447, 91 S.E. 734, which is summarized in a note in 28 A.L.R. 494, it holds "a company supplying water to customers cannot discontinue service for nonpayment of past-due bills for water supplied at a previous time, under a contract made with another concern and assigned to the company; and that mandamus will lie to compel restoration of service in such a case." That this was the real question decided is shown in DePass v. Broad River Power Co., 173 S.C. 387, 176 S.E. 229, 95 A.L.R. 545.

As I see it, the case at bar is much stronger than the Johnson case because here the accounts of the Company were not assigned to the Board, but the Board under its contract with the Company agreed to collect the Company's past-due bills.

This contract between the Company and the Board undertook to adversely affect the duty the Board owed its customers to furnish them current so long as they paid the Board their bills, in that it agreed with the Company it would cut off the customers' current in the event they refused to pay their bills owed the Company for current. In my judgment, the Board had no right to do this. See 17 C.J.S., Contracts, § 222, p. 592, where it is said, "A public service corporation cannot by contract deprive itself of the power, or impair its power, to perform its duties to the public."

For the reasons given I most respectfully dissent.

I am authorized to state that Judge BIRD joins in this dissent.