**UNION ELECTRIC COMPANY, a Missouri corporation, Plaintiff-Respondent,**

v.

**MANSION HOUSE CENTER NORTH REDEVELOPMENT COMPANY et al., Defendants-Appellants.**

No. 56345.

Supreme Court of Missouri, Division No. 2.

May 14, 1973.

William H. Ferrell, Francis L. Barkofske, Keefe, Schlafly, Griesedieck & Ferrell, St. Louis, for plaintiff-respondent Union Electric Co.

Lashly & Neun, Paul W. Lashly, Peter J. Wunderlich, St. Louis, for defendant-appellant Mansion House Center North Redevelopment Co.

MORGAN, Presiding Judge.

Although this appeal stems from a rather novel background, it basically involves an effort by plaintiff to recover the amount allegedly owed by defendants for electric and steam energy provided to them by plaintiff. The trial court found for plaintiff. We affirm.

Plaintiff, Union Electric Company (hereinafter referred to as the Company), is in the business of supplying electric and steam service in the city of St. Louis. Defendants, Mansion House Center North Redevelopment Company, Mansion House Center Redevelopment Company and Mansion House Center South Redevelopment Company (hereinafter collectively referred to as the Consumer), are each limited partnerships which operate comparable apartment and commercial complexes seemingly as one project. Each complex consists of a twenty-eight (28) story apartment building and a three (3) story commercial building. The north and center units were completed during 1966 and the south unit during 1967.

Prior to construction, and over a period of several years, the Company and Consumer had considerable discussion, correspondence and meetings as to the merits of various energy systems. The objective was to determine which system would be the most efficient and economical, and also to project certain "estimated" costs relative thereto upon which Consumer might arrange financing. Such negotiations were culminated by the parties agreeing to and executing certain contracts, to-wit: (1) "Additional Facilities Agreement" on June 15, 1966, (2) "Electric Service Agreement" on June 15, 1966, and (3) "Steam Service Agreement" on January 14, 1967.

Consumer paid the charges submitted until November, 1968, when complaint was made to the Company that the billings exceeded the "estimates." By May of 1969, the statements unpaid amounted to $174,573. During the next month, the Company and Consumer entered into what was designated as an "Escrow Agreement" calling for the unpaid charges and all future bills to be paid to the Mercantile Trust Company until the dispute was settled. It is agreed that Mercantile is not concerned financially, and that it is named as a party defendant solely as custodian of the disputed funds, which now amount to approximately one million dollars. By the agreement, the parties agreed that one or the other would initiate a declaratory judgment action asking the court to declare the rights of the parties.

The petition filed by the Company detailed the background, now noted, and premised its request for recovery on the following: "Union Electric asserts and alleges that the bills it has rendered and is presently rendering for electric and steam service and related facilities are in every respect accurate and in accordance with the agreements * * * [the electric, steam and facilities contracts heretofore mentioned] * * * and the applicable rates, rules and regulations on file with, and approved by, the Missouri Public Service Commission."

In its answer, Consumer alleges, generally, ". . . that the bills which plaintiff has rendered and is presently rendering for use of its facilities or for electric and steam service are not accurate, just or correct and further are not in accordance with the estimates furnished these defendants by plaintiff . . . ."

Consumer also filed a counterclaim consisting of eleven counts wherein recovery of several millions of dollars was sought. For our purposes here, it is sufficient to say that such claims were based on allegations that the Company carelessly and negligently misrepresented to Consumer the best system to install, the projected useful life of the equipment used and the estimated consumption of energy to accomplish the required objectives.

The trial court ordered that the counter-claim be tried separately, and Consumer continues to protest the propriety of that order. It relies on Rule 55.45(a), V.A.M. R., which provides, in part, that: "A pleading shall state as a counterclaim any claim which at the time of filing such pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim * * *" In response, the Company relies on Rule 66.02 which provides, in part, that: "The court in furtherance of convenience or to avoid prejudice may order a separate trial of any . . . counterclaim . . . ."

The rules in question each have a singular purpose and rest upon a valid premise. They do not conflict with each other. Rule 55.45(a) is designed to discourage a multiplicity of litigation and avoid separate trials of the same subject matter, and in those instances specified in the rule, it is mandatory that a counterclaim be filed. In this manner, the related matters are brought before one court. Only after Rule 55.45(a) has been complied with does Rule 66.02 become significant. It permits the trial court, after consideration has been given to all pleadings filed and the issues therein created, to determine whether it would be more expeditious or convenient to try any of such issues separately and whether such could be done without prejudice to the rights of the parties. As said in B-W Acceptance Corporation v. Benack, 423 S.W.2d 215, l.c. 217 (Mo.App.1967): "Granting a separate trial is discretionary with the trial court and its ruling will be disturbed only if that discretion is abused. Hays v. Proctor, Mo.App., 404 S.W.2d 756[11]; Lightfoot v. Jennings, 363 Mo. 878, 254 S.W.2d 596[4]. One of the obvious purposes of this separate trial rule is to avoid delay. The rule substantially follows Federal Rule of Civil Procedure 42(b). See Vol. 2B, Barron and Holtzoff, Federal Practice and Procedure, § 943, quoting Collins v. Metro-Goldwyn Pictures Corp., C.C.A.2d, 106 F.2d 83, l.c. 87:

'* * * the trial judge has a practical discretion to dispose of them together, but when the natural course of trial indicates that one claim can be disposed of quickly and summarily while the other will require a considerable trial, separation should be possible save in cases where the facts are so inextricably interwoven that it is impossible or at least manifestly unfair.' "

▪ We do not believe the trial court abused its discretion in this case. The Consumer's counterclaim is long and complicated with eleven counts seeking damages relating to architectural plans for the three complexes, life-spans of various pieces of equipment and their efficiency in comparison to other energy systems not used. Resolution of such potentially complicated issues would have no direct bearing on the one issue presented in the Company's petition, which, although involving a large amount of money and a large consumer, is in fact nothing but an action for an unpaid utility bill. On this point, the Company submits for consideration several out-of-state cases, e.g., Huff v. Electric Plant Board, 299 S.W.2d 817 (Ky.App. 1957); Brown v. Illinois-Iowa Power Co., 321 Ill.App. 164, 52 N.E.2d 722 (App.Ct. Ill.1943); and Wisconsin Power & Light Co. v. Berlin Tanning and Manufacturing Co., 275 Wis. 554, 83 N.W.2d 147 (1957), wherein it was apparently held that utility bills cannot be set off or withheld absent a claim of nonconformance with filed tariffs. In view of our finding that the trial court reasonably exercised its discretion, we need not discuss such cases or the effect, if any, local statutes might have had on the decisions therein.

▪ Although the counterclaim is not before us, we do point out that Consumer also based a portion of its answer on the allegation heretofore quoted, that the bills were not "in accordance with the *estimates*." (Emphasis added.) We can find no basis whatever for Consumer's reliance on "estimates." Assuming their relevance to the counterclaim, they have none here.

The Electric Service Agreement (Exhibit No. 14), signed by all parties, provided in paragraph 2, in part: "The electric service provided for hereunder shall be sold and delivered by Company and shall be purchased, received and paid for by Customer under the terms and conditions of Company's Service Classification No. 3—General Service Rate—and Company's General Rules and Regulations, on file with and approved by the Missouri Public Service Commission * * *" Under paragraph 3 thereof, captioned "Character of Service," the Company promised to provide facilities adequate to deliver a capacity "as estimated by Customer." We need not repeat similar language used in the other two agreements pertaining to service for neither was based on any estimates given by the Company to the Consumer.

Finally, we consider the trial itself. The relevant evidence as to the amount owing consisted of the records of the Company, and they were offered in evidence under what is statutorily designated as "The Uniform Business Records as Evidence Law." Section 490.660, RSMo 1969. Thereafter, § 490.680 provides: "A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

 To establish such records as admissible by the statute, the Company offered as witnesses certain of its officers, and employees, to-wit: Supt. of Meter Reading; Supt. of Meter Dept.; Clerical Supervisor, Transmission and Distribution; Mgr. of General Accounting Dept.; Ass't Sec.; Supervisor, Special Accounts and Controls; Senior Supervising Engineer, Commercial and Industrial Power Sales; and, the Supt. of Operations. By their testimony and the records identified by them, each step from the reading of a meter to the submission of a bill was shown. Records pertaining to each step were consolidated into one exhibit of which thirty-seven (37) were offered. Objections to eleven (11) have been carried forward on appeal, but we need not extend this opinion further by detailing the contents and objections made to each. In fairness, most can be considered together. As said in Mitchell v. St. Louis Argus Publishing Company, 459 S.W.2d 1, at 6[9–12] (Mo.App.1970): "The reason the business record exception to the hearsay rule is recognized is the presumptive verity of routine recording of business activities done on a regular basis at times close to the transaction recorded. Kitchen v. Wilson, Mo., 335 S.W.2d 38[6]. To qualify for admission the foundation which warrants the presumption of verity must be laid." Defendants' usual objection was that plaintiff failed to "lay an adequate or proper foundation to qualify the exhibits" under the statute. Such an objection is inadequate in that it failed to inform the court in what respect there had been such a failure. "One of the basic errors which trial counsel have made in this area is the failure to state fully or correctly the grounds for objection to the introduction of a business record." 1964 Wash. U.L.Q. at 52. Henson v. Pascola Stave Co., 190 Mo.App. 471, 177 S.W. 787 (1915). As to certain records, the objection was based on the Company's alleged failure to show the "accuracy" of the same. Such an objection does not attack the admissibility of the record, but goes only to the probative value to be given the exhibit. Objection was also made to Exhibits Nos. 10–13—rate schedules for steam and electricity. They were admissible under § 490.235, Laws 1953, pp. 511–512, § 1. However, two objections do merit consideration.

 First, the Company had one of its officials prepare a detailed summary of all amounts allegedly owed. (Exhibit No. 18.) It was captioned as "Mansion House

Center Billing Explanation," and carries forward month by month the amount due. The compilation of the amount due in any month, in separate columns, reflects volume, rates, adjustments and other items. All of which could be identified with the various steps followed in computing a bill, and the underlying records which were also in evidence. The general rule in connection with use of such a summary was stated by this court in State ex rel. State Highway Commission v. Cone, 338 S.W.2d 22, l.c. 26 (Mo.1960): "To render a summary prepared by an expert of voluminous records admissible in evidence, it is the general rule that the competency of the records themselves as evidence must be established and the records made available to the opposite party for cross-examination." See also 29 Am.Jur.2d, Evidence, § 458, page 517; Berthold-Jennings Lumber Co. v. St. Louis, I. M. & S. Ry. Co., 80 F.2d 32 (8th Cir. 1935). Not only do the parties agree that the records were voluminous, but it is quite obvious from those exhibits filed on appeal. The exigencies of the case called for the use of just such a summary. However, the Consumer, although rather belatedly and after cross-examination of the witness identifying the summary over thirty-five pages of the record, objected on the ground that such records had not been accessible to it and that it had been denied an inspection thereof. Since the controversy had extended over several years, and the suit had been filed over a year prior to trial, we cannot help but notice that Consumer failed to seek any discovery by deposition, interrogatories, motions to produce or inspect or otherwise. Nevertheless, it is true that an exhaustive discovery effort would not necessarily reflect that the custodian of the underlying records intended to consolidate his proof in such a summary. To comply with the rule, the Company should have notified Consumer it so planned. "Mosts courts require, as a condition, that the mass thus summarily testified to shall, if the occasion seems to require it, be placed at hand in court, or at least be made accessible to the opposing party, in order that the correctness of the evidence may be tested by inspection if denied, or that the material for cross-examination may be available * * *" Wigmore on Evidence, Vol. IV, § 1230, page 535; Jones on Evidence, Sixth Edition, Vol. 2, § 7:30, page 142. From the texts cited, it is apparent that the extent of notice required to be given by the custodian of the records varies in different jurisdictions. We believe that it is sufficient to require that such a notice be given within a reasonable time prior to the actual use of a summary. The length of time necessary to be called "reasonable" would vary in each case dependent upon the volume of the records summarized. Such a decision is properly for the trial court and absent an abuse thereof should not be disturbed. In this case, the trial court commendably solved the problem without prejudice to any of the parties. The Company was instructed to make all underlying records available to Consumer, and the record shows a compliance with said instructions. A recess of six days was ordered with Consumer directed to make all inspections thought necessary. Although this was a court-tried case, the delay necessarily disrupted an orderly trial. With a jury, the result would have been more undesirable. For that reason, the better practice demands that the custodian of records, and the proponent of a summarized version thereof, notify the opposing party of plans to use a summary and offer to make the underlying records accessible prior to trial.

When court reconvened, it is of some interest that Consumer did not challenge any of such underlying records by offering any testimony. In fact, no evidence whatever was offered on behalf of Consumer.

■ Second, the Consumer objects to certain computer readouts as business records under the statute, and specifically says there was no attempt "to interpret and prove the accuracy or the meaning of the computer punching on various cards." The latter objection as to accuracy does

not go to the question of admissibility, but the challenge to "readouts" must be considered. In its brief, the Company submits that: "Computer billing has become commonplace only during the last several years. Consequently there are not many decisions concerning the admissibility as business records of computer billing printouts. However, in each instance in which the question has arisen, the Court has held computer bills admissible under the Uniform Business Records Act." Cases cited are: Transport Indemnity Co. v. Seib, 178 Neb. 253, 132 N.W.2d 871, 11 A.L.R.3d 1368 (1965); Merrick v. United States Rubber Co., 7 Ariz.App. 433, 440 P.2d 314 (1968), and, United States v. DeGeorgia, 420 F.2d 889, 893 (9th Cir. 1969). As said in the Transport Indemnity Company case, supra, wherein computer readouts were approved as business records under a similar act: "No particular mode or form of record is required. The statute was intended to bring the realities of business and professional practice into the courtroom and the statute should not be interpreted narrowly to destroy its obvious usefulness." We agree with the conclusion just quoted. To rule otherwise would be a violation of the dictates of § 490.690 which, in part, provides that the Act "be so interpreted and construed as to effectuate its general purpose." Furthermore, it is common knowledge, which a court need not ignore, that computerized record keeping is rapidly becoming a normal procedure in the business world. There is no merit in Consumer's objection relative thereto.

Lastly, the Consumer objects to the trial court order that the escrow agent immediately disburse the impounded funds to the Company, and contends that distribution await a final judicial resolution of the counterclaim. After carefully reading the Escrow Agreement, we agree with the order of the trial court in all its particulars.

The judgment is affirmed.

All of the Judges concur.